ALASKA JUNEAU GOLD MINING CO. v. NORTHERN LUMBER MILLS.

(First Division.    Juneau.    April 30, 1915.)

No. 1020-A.

1. NAVIGABLE WATERS ⬅43(2)—WHARVES—RIGHT TO CONSTRUCT.

The upland owner in Alaska has the same right of free and unobstructed access to navigable waters in front of his lands, and in the same way, as the abutter on any other highway; and he has the right to construct a wharf between his land and deep water, to facilitate his access to and from the navigable waters, and for wharfage purposes.

2. NAVIGABLE WATERS ⬅39(3)—LITTORAL RIGHTS—ACCESS.

The upland owner's right of access from his land to the navigable waters across the foreshore is only an easement for use in facilitating such access. If he has no use for the access, the mere right of access is ineffective.

3. NAVIGABLE WATERS ⬅43(4)—OBSTRUCTIONS—INJUNCTION.

If the owner of upland abutting on navigable waters in Alaska has other and equally convenient means of access to it, and will not suffer any material damage by the alleged obstruction, equity will not interfere.

4. NAVIGABLE WATERS ⬅39(2)—TIDELANDS—LITTORAL RIGHTS.

Before an owner of uplands abutting on the navigable waters in Alaska can prevent others from using said lands he must show: (1) That he is the littoral proprietor; (2) that he desires to use the tidelands to get to deep water; (3) that the use con-

⬅See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

templated to be made, and the method of availing himself of the use, is reasonable; (4) and that the access is being interfered with.

5. NAVIGABLE WATERS ⊚⟶39(3)—STREETS—TIDELANDS.

Where the town of Juneau laid out a street on the inshore edge of the tidelands, next to the upland owner's boundary line, and raised and planked it above high-water mark, but without acquiring any right thereto from the upland owner, or without any dedication or his consent in any way, such street did not cut off the upland owner's littoral right of free and unobstructed access to the navigable waters in front of his land and across said street and tidelands.

6. NAVIGABLE WATERS ⊚⟶43(4)—INJUNCTION—TIDELANDS.

The plaintiff's right of access not being limited to the right of mere physical passage over the tideland, but embracing also the right to use the foreshore in such way as may be needed for the complete and innocent enjoyment of that right, it follows that he is entitled to an injunction against any interference with that right.

Hellenthal & Hellenthal, of Juneau, for plaintiffs.
John Rustgard, of Juneau, for defendant.

JENNINGS, District Judge. It would serve no good purpose to review the many authorities cited by the parties to this suit as to rights of an upland owner in Alaska, for those rights have so often received consideration from the Circuit Court of Appeals of the Ninth Circuit that it is too late to question, in this court at least, the doctrines announced by our appellate court.

Plaintiff contends that the upland owner is entitled to "wharf out," while defendant controverts this contention. By the plaintiff the court is referred to the case of Dalton v. Hazelet, 182 Fed. 562, 105 C. C. A. 99, where our Circuit Court of Appeals sustained the right of Hazelet to wharf out; and by defendant the court is referred to the language of Judge Gilbert in McCloskey v. Pacific Coast Co., 160 Fed. 794, 87 C. C. A. 568, 22 L. R. A. (N. S.) 673, as follows: "While it had not the right to wharf out on the tidelands in front of its property"— and to other cases in which the "right to wharf out" is in general language denied.

There is no conflict between the principles enunciated in these two cases from our appellate court. It is laid down in the

⊚⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

case of Columbia Canning Co. v. Hampton, 161 Fed. 64, 88 C. C. A. 224, and the case of Barron v. Alexander, 206 Fed. 272, 124 C. C. A. 336, and in several other cases from the Court of Appeals, that the upland owner has the "right of access to navigable water." Access for the upland owner to and from the navigable water does not mean necessarily access for him merely as a pedestrian, or as an equestrian, or as a teamster. It means access to or from the water in the usual way by which such access is attained and enjoyed; and that is dependent upon the purpose for which such access is desired, and upon the reasonableness of the manner in which it is proposed to make such right available. The right of access to and from the deep water is analogous to the the right of access enjoyed by an abutter upon any other highway. The latter has the right to use his land for the purposes for which he desires and for which it is susceptible. Usually the only useful instrumentality which can approach the upland from the navigable water is one that is capable of navigating the navigable water, to wit, ships, boats, and other water craft. Those are the things which navigate the highway, and those are the things which bring to the upland that which the owner desires to use upon it, and it is by means of these that the owner leaves his land to navigate the highway. Ships are ineffective unless they proceed from one place to another, and they cannot usually land without wharves and docks to tie to, and usually they cannot discharge their freight except by means of wharves. If it be necessary for such "navigators of the highway" to have a wharf to which to make fast in order that this right of access may be enjoyed by the upland owner, then the latter has a right to construct on the shore such a wharf as may be appropriate. He may do this, not because he has a right to erect a structure on the shore, but because he has a right of access to the deep water, and he cannot enjoy that right except by means of a wharf. The right to build a wharf in such cases is not a major right, not an independent right, not an all-sufficient right. It is a qualified right, having no potency whatsoever except in so far as it is referable and appurtenant to, and is a part of, that other right, called the right of access. The owner of a right of access certainly has the right to make his right of access practical.

"It is a general rule that, when the use of a thing is granted, everything is granted by which the grantee may enjoy such use. By

analogy, we may reason that the riparian owner's right of access to the navigable waters in front of his upland comprehends, necessarily and justly, whatever is needed for the complete and innocent enjoyment of that right." Trustees of Brookhaven v. Smith, 188 N. Y. 87, 80 N. E. 670.

And so in the case of Dalton v. Hazelet, 182 Fed. 573, 105 C. C. A. 99, our Circuit Court of Appeals held that Hazelet, although not having, and not claiming to have, any right or title to the soil below high-water mark, yet had the right to build a wharf from his upland to the deep water in order to facilitate his access to and from that deep water, using the following language:

"We think that, under the facts stated, the plaintiff is entitled to be relieved against this obstruction; that, while in a territory a grant of land bordering on or bounded by navigable waters conveys to the grantee no right or title to the shore or soil below high-water mark, nevertheless such a grantee has the right to a free and unobstructed access to such waters. 1 Farnham on Waters, 297. But how shall the littoral owner have access to navigable waters where shoal water intervenes? The Supreme Court has answered this question in Dutton v. Strong, 66 U. S. [1 Black] 23–32 [17 L. Ed. 29], where the court said: 'Wherever the water of the shore, so to speak, is too shoal to be navigable, there is the same necessity for such obstructions as in the bays and arms of the sea, and where that necessity exists it is difficult to see any reason for denying to the adjacent owner the right to supply it; but the right must be understood as terminating at the point of navigability, where the necessity for such erections ordinarily ceases.' "

In Re Union Depot Street Ry. & Transfer Co., 31 Minn. 301, 17 N. W. 629, 47 Am. Rep. 789, it is said:

"This expression, 'to the point of navigability,' must be understood as giving the right to the extent necessary to make the abutting property reasonably available at any ordinary stage of water for any kind of navigation for which the stream is used, and for which it is adapted. * * * It must have reference not only to an ordinarily low stage of water, but also the size and kind of vessels which navigate the stream, and the kind of business done upon it."

There is nothing in Columbia Canning Co. v. Hampton, nor in Barron v. Alexander, nor in any other decision of the Circuit Court of Appeals to which this court's attention has been directed, which is not in strict conformity with the doctrine announced.

In the Columbia Canning Company Case it was neither alleged nor proven that the plaintiff's right of access was cut off. In that case the plaintiff founded his action on an alleged right in himself to keep anybody else from erecting a structure on the tideland in front of his upland because it would interfere with a fish trap which he wanted to build on the tideland (the right to erect such fish trap not being at all referable to any right of navigation or any right of access). The complaint did not allege that the upland owner's access was being interfered with, and the Circuit Court simply held that the complaint did not state a cause of action. In the Barron Case the lower court found as a matter of fact that the erection being made by Alexander did not interfere with any right of access inhering in Barron, and the Circuit Court of Appeals simply sustained the holding. In neither case was it held that the upland owner had not the right to wharf out in aid of his right of access.

## The Right of Access is an Easement Only.

It is said in Yates v. Milwaukee, 77 U. S. (10 Wall.) 504, 19 L. Ed. 984, this right is—

"a right of which, when once it is vested, the owner can only be deprived in accordance with the established law, and if necessary that it be taken for the public good, upon due compensation."

Having, then, that right of which he cannot be deprived by the government, except on due compensation, certainly an intruder cannot deprive him of it, nor can any other person who has no greater right than he has. The upland owner having no property right in the soil of the foreshore, but only a right of access to and from navigable water, the right is only an easement.

It is only for the purpose of use in getting to the highway that the right of access is given; if the upland owner has no use for the access, the mere right of access is ineffective. This is indicated by the following language in Gould on Waters (2d Ed.) § 149, p. 304:

"But a littoral proprietor, like a riparian proprietor, has a right to the water frontage belonging by nature to his land, although the only practical advantage of it may consist in the access thereby afforded him to the water, for the purpose of using the right of navigation. This right of access is his only, and exists by virtue and in respect of his riparian property. It exists, in the case of tide waters,

even when the shore is the sovereign's property, both when the tide is out and when it is in. It is distinct from the public right of navigation, and an interruption of it is an encroachment upon a private right, whether caused by a public nuisance, or authorized by the Legislature."

## Use Must be Reasonable.

This easement, this right of access, like all other easements, is subject to the general rules that the use must be reasonable. Hedges v. West Shore Railroad, 150 N. Y. 150, 44 N. E. 691, 55 Am. St. Rep. 660. And "what shall be deemed a reasonable and proper use of a way depends largely on the local situation and on the public usage." 14 Cyc. 1207.

If the easement is not susceptible to the use for which it was dedicated, there can be no injury for which an injunction will lie. 2 Beach, Equity Jurisprudence, § 713, citing Ruge v. Apalachiacola Co., 25 Fla. 672, 6 South. 489; Prince v. McCoy, 40 Iowa, 533; Bigelow v. Hartford, 14 Conn. 565, 36 Am. Dec. 502.

If the owner of the dominant estate has other and equally convenient means of access to it, and will not suffer any material damage by the alleged obstruction, equity will not interfere. 2 Beach, Injunction, § 1017.

As said in Van O'Linda v. Lothrop, 21 Pick. (38 Mass.) 297, 32 Am. Dec. 261:

"What may be deemed a reasonable and proper use of a way, public or private, must depend much on the local situation, and much on public usage. The general use and the acquiescence of the public is evidence of the right. The owner of land may make such reasonable use of a way adjoining his land, as is usually made by others similarly situated. As to the reasonableness of the use, it may be laid down, that in a populous town where land is very valuable it is not unreasonable to erect buildings and fences on the line of the street and to place doors and gates in them, so as when opened to swing over the street."

"Where a way is granted or reserved without any limitation as to its use it will not necessarily be confined to the purposes for which the land was used at the time the way was created but may be used for any purpose to which the land accommodated by the way may naturally and reasonably be devoted." 14 Cyc. 1207, and cases cited in note 95.

In Barnes v. Midland Ry. Co., 193 N. Y. 386, 85 N. E. 1096, 127 Am. St. Rep. 962, the court said:

"It is enough to say that, either as littoral owner or by virtue of its letters patent, the defendant had the right to construct and

maintain a pier that was reasonably adapted to the purpose for which it was primarily intended, and that was to provide a means of passage from the upland to the sea. To the extent that the reasonable exercise of this right necessarily interfered with the right of the public to pass along the foreshore, the former was paramount and the latter was subordinate; and the logical corollary to that proposition is that, just in so far as the attempted exercise of the littoral or riparian right passed the prescribed bounds of necessity and reason, the conditions were reversed and the right of passage along the foreshore remained the paramount right. That is so because the littoral or riparian owner, in his capacity as such, acquires only those rights in the foreshore which are necessary to enable him to make a reasonable use of his upland; and the principal attribute of such use is access to and egress from the open water. The defendant, therefore, has the right to erect and maintain a pier for the purpose of connecting its upland with the sea. Just so far as it was a necessary consequence of the reasonable exercise of that right to obstruct the foreshore and thus to limit the free and convenient passage of the public the defendant's rights are superior; * * * to the extent that the defendant transcends these bounds, the rights of the public remain unaffected."

It is urged that to accord to the upland owner this right of access would lead to monstrous results. The inquiry is made: If a person owns a mile or more of water front, and is not using and is not needing the foreshore for the purpose of having access to or from the navigable water, is he entitled to sit still and say to every one else: "Although I am not using this foreshore for any useful purpose, yet you shall not erect any structure thereon, because that will preclude me from using the right of access ten years from now." The court has been cited to one case which seems to subscribe to such a doctrine, to wit, Reeves v. Backus Co., 83 Minn. 339, 86 N. W. 337. That is a Minnesota case, and in that state the fee in the land to the center of the stream is in the riparian owner. The answer to the question is found in a consideration of the fact that the right of access is an easement only, and that that easement must be exercised reasonably.

In the case of Coburn v. Ames, 52 Cal. at page 398, 28 Am. Rep. 634, it was said:

"Assuming as we do, for the purposes of this decision, that the riparian owner is entitled to wharf out to deep water, it is clear, we think, that this right is in the nature of a franchise or privilege, to be exercised or not by him at his election. He may never see fit to avail himself of the privilege; and it cannot be pretended that,

while declining to avail himself of his right to wharf out, he is, nevertheless, entitled to the possession of the land below high-water mark, on the theory that at some future time he may possibly change his mind and desire to erect a 'wharf, * * * ' and might prevent others indefinitely from engaging in the enterprise. A theory which works this result cannot and ought not to be upheld. * * * In this state, there are numerous large landed estates, held in private ownership, which front for many miles on the shore of the ocean, and on navigable bays and inlets within the ebb and flow of the tide; and if the doctrine were tolerated that each of these proprietors, while himself declining to erect and maintain the docks, piers, and wharves which are necessary for the convenience of commerce, nevertheless, in virtue merely of his riparian rights, might maintain ejectments for all such structures erected by others, which, when recovered, he might either demolish or cease to use in aid of commerce, it is not difficult to foresee the disastrous consequences which would result from such a doctrine."

In the case of Barron v. Alexander, 4 Alaska, 591, a former judge of this court, citing and quoting from many of the cases here quoted from, announced that the right of access did not necessarily mean access in a line drawn "at right angles to the shore line"; reasonable access, according to circumstances, was all the upland owner was entitled to. Judge Lyons there quotes approvingly from the decision in Taylor v. Commonwealth, 102 Va. 759, 47 S. E. 875, 102 Am. St. Rep. 865, as follows:

"In the case before us the property of the plaintiff is used merely for farming purposes. There has not been erected, and as far as the record discloses there is no purpose to erect, any pier or wharf. She is engaged in no business requiring such access to the channel of the stream as cannot be fully enjoyed consistently with every right which the state has exercised, or which it has delegated to others. The commonwealth holds as trustee a vast body of land covered by the flow of the tide, precisely as in the case before us, for the benefit of her citizens. It is not only her right, but her duty, as such trustee, to render this property productive. Is it reasonable that the commonwealth, holding title to the soil, is to be wholly subordinated in the use of it to the use with which another is clothed merely by virtue of being an owner of the adjoining shore, when the rights of each and all can be fully protected without diminution and without hindrance. If the time should come when the river front of the plaintiff shall be divided into lots whose owners find it necessary to their profitable enjoyment to erect piers and wharves upon them, if they engage in business which shall require exclusive access to the channel of the stream, it may be that a case could then be presented more meritorious than that which we have under consideration, and

in the light of changed conditions the court may be again called upon to consider the respective rights of the riparian owner and those remaining in the commonwealth, or which have been granted by her to others."

From the foregoing it would appear that the claimant of littoral rights must show—

(1) That he is a littoral proprietor,

(2) That he desires to use the tidelands to get to deep water;

(3) That the use contemplated to be made, and the method of availing himself of the use, is reasonable;

(4) That the access is being interfered with.

## Is Plaintiff a Littoral Proprietor?

Plaintiffs acquired the General Grant lode claim from the grantors of defendant and before the defendant acquired any rights. The mining claim was bounded by the beach; the conveyance was on record at the time defendant purchased. Defendant must be held to have known that the mining claim was bounded by the beach. His grantor, Jorgenson, reserved only 1,000 feet along the shore; presumably that is all he needed.

Not only that, plaintiff is a littoral proprietor by virtue of the Indian occupation, to which it succeeded. Indeed, it does not seem to be seriously contended that plaintiff does not own the upland; but it is contended that his littoral rights are cut off by the

## Street.

Defendant contends that the plaintiff has no littoral rights, because, as he asserts, the city of Juneau has opened up a street in front of plaintiff's upland, and thereby a public right intervened (and does now intervene) between the upland and the deep water, and insomuch as plaintiff did not object to the opening up of the street his mouth is now closed.

This contention that there is such a street rests upon the following evidence:

In 1912 the city of Juneau planked over a strip—— feet in width running in front of plaintiff's upland. This suit was brought August 6, 1913. From 1912 to the last-mentioned

date the public have constantly used said street to such an extent that it has become one of the principal streets of the town. Plaintiff has never taken any steps to prevent the public from so using the "street."

However, the evidence also shows that that portion of this so-called street which is in front of the premises in dispute is between high and low water mark; that is, on the tidelands. Now, the public had a right to pass to and fro over that strip of shore, whether there was or was not a street there, provided there was no interference with plaintiff's access to deep water. The planking over of that space and calling it a street did not in any way increase the public right of passage, nor decrease or interfere with plaintiff's right of access. Plaintiff therefore was and is in no position to protest. It does not appear that he has at any time had any standing in equity to protest. An application by him for an injunction against the so-called street would at once have been met with the answer that his right of access has not been impaired. Having, then, no standing to make complaint, he cannot be prejudiced by the fact that he made no complaint.

Plaintiff has never conveyed any of his upland to the city, nor dedicated it to the public use, nor in any way signified his assent to the cutting off of any of the upland rights, nor been shown even to have knowledge that such a claim was in contemplation. No upland rights have been condemned. To say that the mere pronouncement by the city that "this piece of shore land, which, like all other shore land, has been a passageway without cutting off littoral rights, shall from now on be a passageway which shall cut off littoral rights," would be to make an untenable statement. Certainly such a mere pronouncement could not have that effect in one short year.

The Miocene Ditch Case, 146 Fed. 680, 77 C. C. A. 106, and the other cases cited by defendant on this point, depend on the law of estoppel. In each case cited the complainant had it in his power to prevent the taking of his land without compensation. He chose to take no such steps. He stood idly by while large sums were expended, and the courts held that he was relegated to his action for damages. But here the upland owner had no cause for complaint, because his rights were not being interfered with.

The court therefore experiences no difficulty in finding

that the plaintiff is the owner of the upland, and has the usual littoral rights.

We pass, then, to a consideration of

## The Access Desired.

What is the nature and extent of the access desired? Is that nature and extent reasonable? How does plaintiff propose to avail himself of that right of access? Is that way reasonable? These are all pertinent questions.

Plaintiff has shown that it is the owner of a large number of quartz claims in the mountains back of Juneau and that it desires to develop them by transporting the ore taken and to be taken therefrom to the mills which are to be situated upon the mill sites which it has acquired on the upland back of the tideland in controversy. The testimony of Mr. Bradley, the manager of the plaintiff company (as supplemented by Plaintiff's Exhibit Y), is to the effect that on the upland just back of the proposed wharf is to be situated a turbo-electric power house and an oil tank of capacity 30,000 gallons, and that higher up on the upland are to be situated mills with an ultimate capacity of 8,000 tons per day. A pilot mill of 50 stamps has been erected and is in operation, and more than $1,000,000 has been expended in getting ready for the more extensive operations. The tunnel through the mountain for the transportation of ore from the mine to the mill has been completed, and the hauling of ore through it is in active operation. The company has raised $4,000,000 more for the prosecution of the works.

The space on Defendant's Exhibit Y, marked in red "Proposed Wharf," is the site of the obstructions complained of. This space lies wholly on tideland, and in front of the upland of which plaintiff is the owner. Mr. Bradley further testified that on that space plaintiff intended to build a wharf immediately for the receiving of coal, and that on this wharf would be built coal bunkers for the landing and storage of coal to be used in connection with the works. He testified that plaintiff contemplates the immediate erection of the said 8,000-ton milling plant, and that such an undertaking will require a tremendous amount of materials—iron work, steel work, heavy machinery, etc.—and that this must all be landed and assembled, so that it can be handled in the proper way and in the

proper sequence, and that the yarding of such a vast amount of materials and machinery requires considerable area, so located that the materials may be most conveniently handled. When asked if there was any other space available for that purpose, he answered:

"There is a small amount of space between the two points marked 'Warehouse'; but we haven't considered that, because that alone is not sufficient."

The court can see how this might be the case. If in the construction of these mills everything could move like clockwork, if all material could be delivered on the wharf bit by bit exactly when needed, if, when landed, it could be immediately removed from the landing place and installed, it is likely that a wharf smaller than that desired might answer all purposes; but the very nature and magnitude of the enterprise precludes this possibility. Not mining machinery of every kind is kept in stock. Much of it has to be made to order, of particular dimensions, and after special patterns. It requires time in the making. It is not all made by the same concerns. It will not all be delivered at the same time, nor in the same vessels. It is not at all unthinkable that that which is needed at a later date may be delivered at an earlier date. In such cases a vast amount of shifting must be done. That which is delivered before needed must be moved to give place to later shipments. It is reasonable to suppose that large vessels, each freighted with particular kinds of material, may have to be accommodated at the wharf at one and the same time. Lines will have to be run at angles and for considerable distances to hold these vessels. The court has no reason to question the good faith of the enterprise, nor to doubt Mr. Bradley's statement that all this space will be needed, and that the company purposes to proceed immediately. The witness furnished no figures or estimates, and contented himself with the general statement; but this was sufficient on direct examination, and he was not cross-examined on that point. The court concludes that the figures and estimates could have been given and would have borne him out. It all seems reasonable, and there is no evidence to the contrary.

It may be true that the plaintiff has other water frontage further down the channel where it might make a wharf. The court expresses no opinion on that point, for the question is

not whether or not some other place might be put up with, but whether or not the place which is desired is reasonable and proper. It surely is not unreasonable to desire that the landing place of the materials shall be as near to the place of proposed use as it is practicable to ·have it.

It is found, therefore, that the proposed use of the right of access is necessary and reasonable.

The plaintiff's right of access not being limited to the right of mere physical passage over the tideland, but embracing also the right to use the foreshore in such way "as may be needed for the complete and innocent enjoyment of that right," it follows that he is entitled to an injunction against any interference with that right.

It may be a hardship on defendant thus to be confined to the 1,000-foot reservation made in the deed to plaintiff's grantors; but I cannot see how that is to be avoided. One man's necessities cannot be made the measure of another man's rights. When Jorgenson reserved the 1,000-foot strip, presumably that is all he wanted. The sovereignty grants the upland, and thereby burdens the tideland with the easement; and any one occupying the tideland does so subject to the easement. That is defendant's situation as to any occupancy outside of the 1,000-foot reservation.

The findings and decree will be for the plaintiff. I am not so sure, however, about the form of the injunctive part of the decree. Until these obstructions actually interfere with the work of building, plaintiff has no right to injunction. Let the decree be so framed that, in case there is built a wharf smaller than the one contemplated, or in case no wharf at all be constructed, defendant will not have been needlessly deprived of the advantage which his occupancy and use of the tideland has obtained for it. There must be precedents for such form of injunction. Counsel might examine Crocker v. Manhattan, 31 Misc. Rep. 687, 66 N. Y. Supp. 84, modified in 61 App. Div. 226, 70 N. Y. Supp. 492; McCann v. Chasm Power Co., 151 App. Div. 304, 136 N. Y. Supp. 383; Loukes v. Payne, 140 App. Div. 776, 125 N. Y. Supp. 850.