**Thomas J. CLASSEN, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HIGHWAYS, Appellee.**

No. 4332.

Supreme Court of Alaska.

Dec. 12, 1980.

Thomas E. Fenton, Call, Haycraft & Fenton, Fairbanks, for appellant.

William R. Satterberg, Jr., Asst. Atty. Gen., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.*

## OPINION

BURKE, Justice.

This inverse condemnation action requires us to determine whether a landowner is entitled to be compensated for the alleged taking of his riparian rights by the state. Specifically, we must decide whether the state is constitutionally obligated to pay damages to Thomas Classen, because the construction of the new Parks Highway bridge in Fairbanks destroyed his ability to use his residence on the Chena River as the base for his floatplane air taxi service.

Classen operated an air taxi business from his home from 1969 to 1975. Customarily, he would taxi his floatplane down the Chena River, under the University Avenue bridge, and then take off. The point at which he became airborne varied with his load. One day in the fall of 1975, Classen was taking off, unaware of the construction of the new Parks Highway bridge. With a moderately heavy load, he narrowly missed a steel casing extending thirty feet into the air. Classen has not used that stretch of the river for takeoff since.[1] Instead, he relocated his business to the float pond at Fairbanks International Airport, a move which has substantially increased his operating costs.

On November 18, 1975, Classen filed an inverse condemnation action against the state. The case was tried without a jury in October, 1977. The superior court found that there had been a "taking" of Classen's ability to use the river,[2] and ordered further briefing on the question of compensability. In March, 1978, the court ruled in favor of the state on the latter question. Classen has appealed from the adverse judgment.

In *Wernberg v. State*, 516 P.2d 1191 (Alaska 1973), *reh. denied*, 519 P.2d 801 (Alaska 1974), we held that a property owner may recover for loss of his or her access to navigable waters under article VIII, section 16 of the Alaska Constitution.[3] *See also Grant v. State*, 560 P.2d 36 (Alaska 1979). In our opinion in *Wernberg* we discussed riparian rights and their compensability:

The particular rights delineated by the doctrine are, naturally, many and varied. Generally speaking, a riparian proprietor has the right to: (1) use the water for general purposes such as bathing and other domestic activities; (2) have access to navigable waters; (3) build wharves and piers out to deep water if this can be done without interfering with navigation; (4) take title to accretions and alluviums; and (5) make other beneficial use of the water even though the water level is lowered, so long as the use does not unreasonably interfere with similar rights of other riparians. These rights are valuable property, and ordinarily cannot be taken for public use by the federal or state governments without payment of just compensation to the landowner.

---

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

1. He explained that it is impractical and unsafe for him to taxi under both bridges before taking off: "step taxiing" at high speed would be too dangerous because of the blind curves in the river, while slow taxiing takes too long and causes problems for the airplane's engine.

2. The state had attempted to prove at trial that the new bridge had not impaired Classen's use of the river, because he could still take off with a light load and because the river had always been dangerous.

3. Art. VIII, § 16 provides:

   *Protection of Rights.* No person shall be involuntarily divested of his right to the use of waters, his interests in lands, or improvements affecting either, except for a superior beneficial use or public purpose and then only with just compensation and by operation of law.

*Id.* at 1194–95 (footnotes omitted).[4] Classen claims that his use of the Chena River was compensable under *Wernberg* as "a right of access [to the air by use of the water]." We do not agree.

Leslie Wernberg was the owner of property abutting Chester Creek, which empties into Cook Inlet. For more than twenty years he used the creek to navigate his fishing boats between his property and Cook Inlet for commercial fishing. However, with the construction of the Minnesota By–pass, his access from Chester Creek to Cook Inlet was made impossible. Holding that Wernberg had a riparian right of access to the waters of Cook Inlet, we emphasized that, "as to the limited facts set forth with reference to deprivation of his use of such a private littoral right, he alleged a valid claim for compensation." 516 P.2d at 1201.

Our holding in *Wernberg*, however, turned in large part on the potential adverse effects a contrary holding would have on land values in Alaska:

> We are concerned that the uncompensated taking of such a littoral access right may effectively render abutting land valueless or greatly reduce it in value. Alaska has a seacoast longer than that of the entire United States. A large number of Alaskan communities are located on the shores of bays and inlets in order to gain water access for transportation and shipping, or easy access to the fertile fishing grounds of Alaska. A substantial amount of development in these cities is along the waterfront. . . . [A] declaration that littoral access may be taken for any public purpose without compensation will immediately devalue property in such areas and limit the development of many isolated communities whose only means of access is by water.

516 P.2d at 1200–01. It is our opinion that a ruling adverse to Classen here would not have the same effect, and that *Wernberg*, therefore, does not support the expanded definition of access that he advocates. *See also Commonwealth v. Thomas*, 427 S.W.2d 213 (Ky.1968).

■ Classen still has unlimited access to the river itself, for whatever use he chooses to make of it. His decision to move his floatplane operation was based upon considerations of cost and convenience to himself. While construction of the Parks Highway bridge may have made his floatplane operation more expensive and difficult, by making it necessary for him to taxi farther in order to take off safely with a heavy load, it did not actually prevent his use of the river for that purpose. And, while Classen's property may have lost some of its value as a result, not all such unfortunate consequences of public projects are compensable. *See, e. g., B & G Meats, Inc. v. State*, 601 P.2d 252 (Alaska 1979) (loss in business resulting from change from two–way to one–way road not compensable).

■ Instead of a claim based on interference with traditional riparian rights, Classen's position amounts to a claim for damages for an interference with a purported easement for the use of airspace. Classen's use of the river is analogous to an airport's need for a "clearance" or "obstruction" easement to ensure that takeoffs and landings can be made safely.[5] As Classen does not claim to have been *granted* an easement, his only possible right to an easement would be by *prescriptive use*. However, an easement may not be acquired by prescription against the state. *See* AS 09.-25.050; AS 38.95.010. Thus, like the superior court, we conclude that the state's actions did not deprive Classen of a compensable property right. We need not determine whether an airspace easement may be ac-

---

4. Our decision in *Wernberg* implied that the "use of water" language of art. VIII, § 16 is coterminous with riparian rights. We will construe that language in the same way here.

5. Such easements allow the holder to maintain an area surrounding the airport free of intruding natural or man–made objects. Because an airplane normally flies in an area above that kept clear by an obstruction easement, such easements have been distinguished from "avigation" easements, which allow flights in a specified path. *United States v. Brondum*, 272 F.2d 642 (5th Cir. 1959).

quired by prescription against a party other than the state.[6]

The judgment of the superior court is AFFIRMED.

---

**6.** The courts have recognized that a prescriptive easement may arise where an airport commits an actionable invasion of a landowner's property for the prescriptive period. *Ackerman v. Port of Seattle*, 55 Wash.2d 400, 348 P.2d 664, 667 (1960); *Drennen v. County of Ventura*, 38 Cal.App.3d 84, 112 Cal.Rptr. 907 (1974). *Accord*, R. Wright, The Law of Airspace 191 (1968); Russell, Recent Developments in Inverse Condemnation of Airspace, 39 J.Air.L. & Com. 81, 99 (1973). However, in the case of an obstruction easement, the right sought is not the affirmative one of otherwise unprivileged use of airspace, but the negative right to prevent the construction or maintenance of structures encroaching upon the desired airspace. The general rule is that negative easements cannot be created by prescription, "because the claimant of such an easement does not become subject to legal action at the hands of the owner of the potential servient estate by engaging in the conduct appropriate to establish such an easement." 3 R. Powell, The Law of Real Property ¶ 413, at 34–119 (Rohan rev. ed. 1979). Thus, cases decided at the infancy of air age would allow a landowner adjacent to an airport to "erect flagpoles, factory chimneys, or tall buildings across the whole of its land ... notwithstanding it might have entirely prevented the landing of airplanes...." *Capitol Airways, Inc. v. Indianapolis Power & Light Co.*, 215 Ind. 462, 18 N.E.2d 776, 778 (1939). *See also Strother v. Pacific Gas & Electric Co.*, 94 Cal.App.2d 525, 211 P.2d 624, 632 (1949). However, the possibility of a prescriptive easement in this situation has been recognized by at least one court. *Shipp v. Louisville and Jefferson County Air Board*, 431 S.W.2d 867, 870 (Ky.1968), *cert. denied*, 393 U.S. 1088, 89 S.Ct. 880, 21 L.Ed.2d 782.