CARNEY, Justice.
I. INTRODUCTION
Jerry and Brenda McCavit built a dock extending into Wasilla Lake from their upland property. Their neighbors, Barbara and Louis Lacher, sued the McCavits claiming the dock unreasonably interfered with their riparian rights and constituted a private nuisance. The superior court found for the Lachers and issued an injunction ordering the McCavits to remove a portion of their dock. The McCavits now appeal. Because we announce a new rule of reasonableness regarding riparian or littoral rights, we vacate the superior court's Findings of Fact and Conclusions *729 of Law and Order Granting Injunctive Relief and Nuisance Abatement, remand for the superior court to conduct the proper legal analysis, and vacate the superior court's award for attorney's fees and costs.
II. FACTS AND PROCEEDINGS
A. Facts
Barbara and Louis Lacher own property abutting Wasilla Lake. Jerry and Brenda McCavit own adjacent property abutting Wasilla Lake to the east of the Lachers' property. Both families own their respective property up to the ordinary high water mark of Wasilla Lake, making them littoral landowners.[1] The Lachers purchased their property in 1974 and the McCavits purchased their property in 1991.
When the McCavits bought their property, neither they nor the Lachers had a dock. For 30 years the Lachers' western neighbors allowed the Lachers to use their dock. But in 2012 or 2013, after several incidents involving the Lachers' grandchildren, the western neighbors asked the Lachers to stop using the dock. The Lachers then began considering building a dock from their own property.
Meanwhile in March 1992, the McCavits were granted a permit from the Alaska Department of Fish and Game (ADFG) to construct a dock from their property into Wasilla Lake.[2] They completed their dock before the permit expired at year's end. Between 2011 and 2012 the McCavits built a 16x20 foot extension to the original dock. They never sought nor were granted a permit for this extension. The extension was attached at a right angle to the original dock, and extended in the direction of the Lachers' property.
Both families make use of the lake. The McCavits, their family, and their friends use and frequently park a variety of watercraft at the McCavits' dock during the summer. Jerry McCavit testified that he built the extension to accommodate larger watercraft, to reach deeper water, and to make it easier for his aging father to visit. The Lachers and their family and friends also enjoy using the lake. Their children and grandchildren often use the lake for swimming, boating, fishing, and other recreational uses.
In the spring of 2012 the Lachers informed their daughter, Randy Lacher, about their displeasure with the McCavits' dock and the fact that it was "in front of" their property. Randy, who was then employed by the Alaska Department of Natural Resources (DNR), began making inquiries into her parents' rights regarding the lake and the McCavits' dock. Randy obtained a copy of the agency's "Generally Allowed Uses" regulation. The regulation allows an upland littoral property owner to build a dock for personal, noncommercial use provided the dock is within the "projected sidelines" of the upland littoral property or is built with consent of the neighboring upland littoral property owner.[3] After receiving the copy of the regulation, Randy contacted Jerry McCavit to discuss the dock and whether it was "in front of" the Lachers' property.
Later in the summer of 2012 ADFG sent the McCavits a Notice of Violation advising them that their dock extension was constructed in violation of permitting requirements. Although it is possible that the McCavits' construction of the extension could have supported a misdemeanor charge,[4] ADFG took no further action. In November the Lachers obtained a permit to construct a 10x50 foot dock that would extend from their *730 property. However the Lachers never constructed or made definite plans to construct a dock.
B. Trial Proceedings
In early 2013 Randy attempted to have DNR enforce its "Generally Allowed Use" regulation against the McCavits' dock. She was informed that DNR could not enforce the "projected sidelines" language because the Commissioner had found the language vague and ambiguous. After being advised that they would need to pursue a civil suit to obtain the relief they sought, the Lachers sued the McCavits in superior court. They brought three claims: the dock interfered with their riparian rights, constituted a private nuisance, and was a trespass.
The court granted the McCavits' motion to require the Lachers to join DNR as a necessary party because the dock was located on state land. In response the Lachers amended their complaint to allege that DNR violated their due process rights by arbitrarily and capriciously failing to enforce the "Generally Allowed Use" regulation. DNR successfully moved for summary judgment, arguing that it was not required to act, and was dismissed as a party. The court's order held that: (1) the Lachers did not have a "significant property interest" in the submerged lands of Wasilla Lake; (2) at most the Lachers had a right of reasonable access to Wasilla Lake, which "ha[d] not been completely obstructed by the McCavits' dock"; and (3) if DNR had found that the McCavits' dock violated the "Generally Allowed Uses" regulation, that decision would have been arbitrary and capricious because DNR had previously found the term "projected sidelines" vague and ambiguous.
The McCavits also moved for summary judgment on the Lachers' trespass claim, arguing that the Lachers did not have title to the lake and therefore could not maintain a trespass claim. The superior court agreed and granted summary judgment on this claim.
Trial proceeded on the remaining claims of unreasonable interference with riparian rights and private nuisance. The Lachers' witnesses testified that the Lachers' preferred location for their potential dock would be on the eastern side of their property, which would conflict with the McCavits' existing dock. But witnesses also acknowledged that the Lachers could build a dock elsewhere on their property so as not to conflict with the McCavits' dock.
After four days of trial the superior court issued its Findings of Fact and Conclusions of Law and Order Granting Injunctive Relief and Nuisance Abatement on May 7, 2017. The court found that the McCavits' dock unreasonably interfered with the Lachers' riparian rights and constituted a private nuisance. It ordered the McCavits to remove a portion of their dock.
C. Post-Trial Proceedings
Later in May 2017 the Lachers moved for attorney's fees and costs as the prevailing party under Alaska Rule of Civil Procedure 82. They submitted fees and costs dating from 2012 and including fees incurred as part of their claims against DNR upon which they had not prevailed. The Lachers asserted that they were entitled to 30% of their fees of $120,070, which amounted to $36,021.[5] The superior court awarded the full $36,021 over the McCavits' objection. The court's order included a handwritten note: "The Court is not persuaded that some of plaintiffs' fees must be allocated to their litigation against DNR. The State became a party only due to the McCavits' insistence that DNR was a necessary party."
The McCavits moved for a stay of the superior court's injunction pending this appeal. The superior court denied this motion, but in doing so "clarified" its original decision. The superior court noted that it had "already determined the merits of this case and ... found the McCavit[s'] dock to be a nuisance to the Lacher[s]." In February 2018 we granted the McCavits' motion to stay the injunction pending resolution of this appeal.
The McCavits appeal. They contend that the superior court erred in determining that their dock unreasonably interfered with the *731 Lachers' riparian rights and constituted a private nuisance, and that injunctive relief was therefore inappropriate. Because the superior court had not yet ruled on the Lachers' motion for attorneys fees when the McCavits filed their opening brief, we granted their motion to allow supplemental briefing on attorney's fees.[6] We therefore also address the award of attorney's fees and costs.
III. STANDARD OF REVIEW
"[W]e will not consider arguments that were not raised below, unless the issues establish plain error, or the issues (1) do not depend upon new facts, (2) are closely related to other arguments at trial, and (3) could have been gleaned from the pleadings."[7]
"[W]hether the superior court applied the correct legal standard"[8] and "used the appropriate burden of persuasion"[9] are questions of law. We consider "whether a trial court has applied the correct legal test" to be a question of law.[10] We review questions of law and a superior court's application of the law to facts de novo, using our independent judgment to "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[11]
IV. DISCUSSION
A. The McCavits Did Not Waive Any Of Their Arguments On Appeal.
The Lachers first argue that the McCavits waived several of their arguments on appeal by failing to raise them during the trial proceedings.[12] But because the McCavits did raise these issues during the trial proceedings, the issues have not been waived.
B. The Superior Court Applied The Proper Standard Of Proof.
The Lachers also claim that the McCavits waived their argument that the superior court improperly applied the preponderance of the evidence standard of proof because they did not request the court to apply a different standard. The McCavits respond that "[p]arties do not have to invoke burdens of proof and persuasion; they are automatic."
"Preponderance of the evidence is the general burden of persuasion in civil cases."[13] A party that wants the court to apply a higher standard of proof must request it;[14] failure to raise this issue before the trial court fails to preserve the issue for appeal.[15] When a party fails to preserve such *732 an issue for appeal, we review it for plain error.[16]
To demonstrate plain error, the McCavits must prove that "an obvious mistake has been made which creates a high likelihood that injustice has resulted."[17] Such a mistake is not present in this case. In Fernandes v. Portwine we explicitly held that preponderance of the evidence is the appropriate standard of proof for nuisance cases.[18] The McCavits primarily rely on Spenard Action Committee v. Lot 3, Block 1, Evergreen Subdivision[19] to argue that clear and convincing evidence should apply. But we distinguished Spenard Action Committee in Fernandes .[20] In Spenard Action Committee the statutes at issue were "quasi-criminal nuisance statutes"[21] that imposed heavy sanctions and therefore demanded a higher burden.[22] In Fernandes we rejected the suggestion that the higher burden was appropriate in the absence of such concerns and held that a preponderance of the evidence standard applied in private nuisance cases.[23] The McCavits have failed to demonstrate that the present case demands the higher standard employed in Spenard Action Commitee . The superior court did not plainly err by applying the preponderance of the evidence standard of proof.
C. We Extend Our Rule Of Reasonable Use To Riparian And Littoral Landowners And Remand For The Superior Court To Apply The Rule To Determine Whether The McCavits' Dock Was An Unreasonable Interference With The Lachers' Littoral Rights.
1. Riparian and littoral rights defined
Alaska is unique in that "[t]he people of the state have a constitutional right to free access to and use of the navigable or public water of the state."[24] This constitutional right does not create a private cause of action; rather, the constitutional right of free access to and use of navigable or public water is a right shared by the public[25] and enforced by the State.[26]
Litigation over water rights frequently involves competing consumptive uses, such as a riparian or littoral landowner's right to appropriate a quantity of water for purposes such as agriculture.[27] Alaska *733 has adopted the Water Use Act to regulate the appropriation and consumptive use of water.[28] But the McCavits' dock is not a consumptive use of water; the McCavits built a structure in the water and the Lachers allege that the placement of the structure affects their property rights.
Our previous cases regarding non-consumptive uses of water have not involved the rights of riparian neighbors. We have considered competing non-consumptive uses in the context of the natural flow of surface water, specifically surface water drainage,[29] melting permafrost drainage,[30] and surface water diversion.[31] We have generally applied the reasonable use rule allowing the riparian or littoral landowner "to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes harm to others, but incurs liability when his harmful interference ... is unreasonable."[32]
We must now consider different non-consumptive uses: the right of access and the right to use. Because we have applied the reasonable use rule in other cases involving the non-consumptive use of water, we extend its application to this arena. In applying such a rule, we must consider what rights each littoral landowner has and how those rights affect a neighbor's correlative rights.
a. Right of access
i. Overarching right of access
Before statehood there was a general common law riparian and littoral right of access to "deep" or "navigable waters."[33] Under this general law, a riparian or littoral landowner had "the right of access to [deep or navigable] waters for the purpose of navigation," upon which the owner could base an "action against an intruder who places obstacles on the shore that prevent him [or her] from having access to the navigable waters."[34] Several cases affirmatively recognized this general rule before Alaska became a state.[35]
After statehood, in Wernberg v. State we specifically recognized that the right of riparian and littoral landowners of access to deep or navigable waters from their upland properties was a private property right that could not be taken for public use by the government unless it paid just compensation.[36] We were particularly concerned that, due to Alaska's unique geography and economy, taking such a right from a riparian or littoral landowner without just compensation would render property valueless or greatly reduce its value.[37] Without discussing the full scope of this right, we noted that the right of access includes more than just access to the main stream of a channel.[38]
*734 We revisited the issue in Classen v. State, Department of Highways , setting some limits on the right of access. In that case, a riparian owner challenged the construction of a bridge that would interfere with his floatplane business.[39] We held that the bridge was not a taking of the landowner's riparian right of access because he "still ha[d] unlimited access to the river itself, for whatever use he cho[se] to make of it"; only his access to the air via the river was obstructed.[40] Thus, although Wernberg had broadened the right of access, it was not so broad as to include a riparian or littoral landowner's right of access to the air via navigable water.
ii. Right to wharf out
Pre-statehood courts considered the right to wharf out as a subsidiary to the right of access, meaning a riparian or littoral landowner only had the right to wharf out as the means by which he or she exercised the right of access.[41] In Dalton v. Hazelet the Ninth Circuit noted that owners of "land bordering on or bounded by navigable waters ... ha[ve] the right to a free and unobstructed access to such waters."[42] In Alaska Juneau Gold Mining Co. v. Northern Lumber Mills , the territorial court noted that the right of access to navigable water meant "access to or from the water in the usual way by which such access is attained and enjoyed; and that is dependent upon the purpose for which such access is desired, and upon the reasonableness of the manner in which it is proposed to make such right available."[43] Comparing the right of access to navigable waters to that of access to a highway, the court explained that a littoral landowner had the right to wharf out "not because he [or she] ha[d] a right to erect a structure on the shore, but because he [or she] ha[d] a right of access to the deep water, and ... [could not] enjoy that right except by means of a wharf."[44]
But the territorial court limited this right: "[T]he use must be reasonable. ... And 'what shall be deemed a reasonable and proper use of a way depends largely on the local situation and on the public usage.' "[45] It announced that "reasonable access, according to circumstances, [is] all the upland owner [is] entitled to."[46] Additionally, the territorial court noted that it would not intervene if a riparian or littoral landowner "has other and equally convenient means of access" to navigable waters or if the landowner had not yet reasonably exercised his or her right of access.[47]
Since statehood we have had only one opportunity to discuss the right to wharf out, in State, Department of Natural Resources v. Alaska Riverways, Inc.[48] There we concluded that Wernberg did not create an independent right to wharf out, and all that existed was "the common-law right ... that was recognized in territorial days."[49] We noted, however, that this common-law right to wharf out "is limited by the state's exercise of its authority under the public trust doctrine" as incorporated by the Alaska Constitution *735 and Alaska Statutes.[50] Thus, the right to wharf out is the means by which a riparian or littoral landowner may exercise his or her right of access to deep or navigable waters, and it may not be unreasonably obstructed. This right is a qualified right and subject to the State regulations.[51]
b. Right to use
Article VIII, § 16 of the Alaska Constitution establishes a right to common use of public and navigable state waters that protects a riparian and littoral landowner's right to use the water abutting the land: "No person shall be involuntarily divested of his right to the use of waters ... except for a superior beneficial use or public purpose and then only with just compensation and by operation of law."[52] We noted in Classen that the "decision in Wernberg implied that [this language] is coterminous with riparian rights."[53] Thus, a riparian or littoral landowner has an individual property interest in the use of water abutting his or her land, but we have never specified what types of uses this may include.[54]
Other jurisdictions have upheld a riparian right to use water for recreational purposes.[55] We need not specify types of uses allowed because a reasonable use rule allows for a riparian or littoral landowner to use the abutting waters in any lawful way so long as that use is reasonable.
c. Reasonable use rule
We now extend our rule of reasonableness to determine a riparian or littoral landowner's water rights. In so doing we take into account Alaska's unique public trust doctrine and historical common-law rights. Riparian and littoral landowners have the right of reasonable access to and use of adjacent navigable and public waters of the State, as they are defined by the legislature, so long as the access or use is lawful and does not unreasonably interfere with the correlative rights of other riparian or littoral landowners.[56] What is reasonable is a question of fact,[57] to be determined by weighing a variety of factors.
2. Reasonableness factors
All riparian and littoral landowners have correlative water rights associated with their upland properties. When one landowner's exercise of his or her right interferes with a neighboring landowner's exercise of the same, the court must compare the two uses. The court must consider: (1) whether the injured landowner's allegedly interfered-with use is reasonable, and (2) whether the use causing the alleged interference is unreasonable.
To determine the reasonableness of each landowner's use, the fact finder must consider various factors in the context of the specific facts and circumstances of the particular case. The Restatement (Second) of Torts helpfully outlines various factors that a court may consider: (1) the use's purpose; (2) the use's suitability; (3) the use's economic value; (4) the use's social value; (5) the extent or amount of harm the use causes; (6) the practicality of adjusting the use or method of use to avoid harm; (7) "the practicality of adjusting *736 the quantity of water used"; (8) existing values of the use; and (9) "the justice of requiring the user causing harm to bear the loss."[58]
3. Vacate and remand to apply the rule of reasonableness
Because we are announcing a new rule for the unreasonable interference with riparian or littoral rights, the superior court did not have the benefit of the rule in its application of the law. Pursuant to the rule we now announce, we must vacate the judgment and remand to the superior court to apply it. On remand the superior court must determine the reasonableness of the McCavits' and Lachers' respective littoral uses and conduct the proper balancing test to determine whether the McCavits' use unreasonably interferes with the Lachers' use.[59] The superior court must conduct this test before it can determine whether the McCavits' dock constitutes a private nuisance. An unreasonable interference with a riparian or littoral right might, but also might not, be a private nuisance. While the two torts likely overlap in the present case, they are distinguishable and may not always overlap in every instance.[60] Moreover, if the superior court determines on remand that the McCavits' dock is reasonable or that the Lachers' use is unreasonable, the McCavits' dock necessarily cannot be a private nuisance.
The superior court therefore must first go through the unreasonable interference with riparian or littoral rights analysis to determine whether the McCavits' dock constitutes an unreasonable interference with the Lachers' littoral rights before it can determine whether it constitutes a private nuisance.
D. Private Nuisance
Only if the superior court determines that the McCavits' dock constitutes an unreasonable interference with riparian rights should it consider whether it also constitutes a private nuisance. Alaska Statute 09.45.255 defines private nuisance as "a substantial and unreasonable interference with the use or enjoyment of real property, including water." In Riddle v. Lanser we considered "whether odors emanating from a farmer's storage of [roughly 10 million gallons of] septage on his farmland created a nuisance to adjacent landowners."[61] There, the odors were so significant and the nuisance was so obvious that we found it unnecessary to conduct a balancing test.[62] Here the nuisance is not so obvious.
Additionally, while the Lachers could have and did bring both riparian rights and nuisance claims, these claims overlapped entirely because the Lachers asserted only that the McCavits' dock affected their interests in the access to and use of the water abutting their land.[63] While it is possible that the Lachers could have claimed that the McCavits' dock affected other property rights - such as view and property value - they did not do so. As such, while view and property value *737 may be factors for the court to consider on remand, they may not become new claims and the Lachers are not entitled to any damages based on loss of view or diminution of property value.
E. Attorney's Fees
Alaska Rule of Civil Procedure 82(a) states that, unless otherwise agreed to by the parties or provided by law, "the prevailing party in a civil case shall be awarded attorney's fees." The superior court has broad discretion to determine the prevailing party.[64] But because we remand this case and announce a new balancing test that may "affect the superior court's prevailing-party analysis,"[65] we vacate the superior court's award of attorney's fees.
V. CONCLUSION
Because we announce a new rule of reasonableness, we VACATE the superior court's Findings of Fact and Conclusions of Law and Order Granting Injunctive Relief and Nuisance Abatement, REMAND for the superior court to conduct the proper legal analysis, and VACATE its award of attorney's fees and costs.

Throughout this opinion, we use the terms "riparian" and "littoral" interchangeably. "Riparian" means "[o]f, relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)." Riparian , Black's Law Dictionary (10th ed. 2014). "Littoral" means "[o]f, relating to, or involving the coast or shore of an ocean, sea, or lake." Littoral , id.

See former AS 16.05.870(b) (1987) (requiring permit for construction within anadromous fish habitats).

11 Alaska Administrative Code (AAC) 96.020(a)(2)(B) (2018).

See AS 16.05.881 ("If a person ... begins construction on a work or project or use for which notice is required ... without first providing plans and specifications subject to the approval of the commissioner ..., the person or agency is guilty of a misdemeanor.").

See Alaska R. Civ. P. 82(b)(2).

The McCavits originally appealed on June 5, 2017, but the award for attorney's fees and costs was not issued until December 12, 2017.

Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc. , 32 P.3d 346, 351 (Alaska 2001).

Burton v. Fountainhead Dev., Inc. , 393 P.3d 387, 392 (Alaska 2017) (alteration in original) (quoting Ayuluk v. Red Oaks Assisted Living, Inc. , 201 P.3d 1183, 1194 (Alaska 2009) ).

Fernandes v. Portwine , 56 P.3d 1, 4 (Alaska 2002).

Armstrong v. Tanaka , 228 P.3d 79, 82 (Alaska 2010) ; see Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp. , 129 P.3d 905, 916 (Alaska 2006) ("[W]e think the superior court's failure to make factual findings appropriate to the relevant legal test ... was an error of law, just as erroneous jury instructions are an error of law.").

Riddle v. Lanser , 421 P.3d 35, 44 (Alaska 2018) (quoting Douglas Indian Ass'n v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska , 403 P.3d 1172, 1175 (Alaska 2017) ).

The Lachers claim that the McCavits waived their arguments that: (1) the Lachers' common law riparian rights were extinguished by State, Department of Natural Resources v. Alaska Riverways, Inc. , 232 P.3d 1203 (Alaska 2010) ; (2) the superior court used a vague and ambiguous standard for determining littoral property lines; (3) the superior court erred by maintaining the Lachers' private nuisance claim; and (4) the superior court improperly considered evidence of view and property value.

Fernandes , 56 P.3d at 5.

See Lindbo v. Colaska, Inc. , 414 P.3d 646, 651 (Alaska 2018) ("An objection is properly raised only if that party 'provide[d] the superior court with an "identifiable opportunity to rule on the issue." ' " (alteration in original) (quoting Reust v. Alaska Petroleum Contractors, Inc. , 127 P.3d 807, 816 (Alaska 2005) )).

We have similarly ruled that a party must raise an argument regarding the allocation of a burden of proof below in order to preserve the issue for appeal. See Reust , 127 P.3d at 816 ("[The party's] failure to offer proposed language that would have correctly allocated the burden of proof means that [it] did not provide the superior court with an 'identifiable opportunity to rule' on the issues it now raises." (quoting Manes v. Coats , 941 P.2d 120, 125 n.4 (Alaska 1997) )).

Id.

Lindbo , 414 P.3d at 652 (quoting Small v. Sayre , 384 P.3d 785, 786 (Alaska 2016) ).

Fernandes , 56 P.3d at 5.

902 P.2d 766 (Alaska 1995). They also refer to an unpublished decision, Trails North, Inc. v. Seavey , to support their argument. Nos. S-8425/S-8505, 1999 WL 33958785 (Alaska Dec. 1, 1999).

56 P.3d at 5.

Id. at 5.

The statutes at issue were AS 09.50.170 -.240, which govern abatement of illegal uses of premises. Spenard Action Comm. , 902 P.2d at 774. The severe sanctions discussed in the case dictate that "[a]ll personal property used in the nuisance must be removed and sold, and the building used in the nuisance must be closed for one year." Id. at 775 ; see also AS 09.50.210(a).

Fernandes , 56 P.3d at 5.

AS 38.05.126(a), (b) ; see also State, Dep't of Nat. Res. v. Alaska Riverways, Inc. , 232 P.3d 1203, 1211 (Alaska 2010). Wasilla Lake is one such navigable water held in trust by the State. Wasilla Lake , Alaska Dep't of Fish & Game , http://www.adfg.alaska.gov/index.cfm?adfg=fishingSportLakeData.lakeDetail& LakeID=205 (last visited July 11, 2019).

See Alaska Const. art. VIII, § 16 ; see also AS 38.05.126(c) ("Ownership of land bordering navigable or public water does not grant an exclusive right to the use of the water and a right of title to the land below the ordinary high water mark is subject to the rights of the people of the state to use and have access to the water for recreational purposes or other public purposes for which the water is used or capable of being used consistent with the public trust."); Alaska Riverways, Inc. , 232 P.3d at 1212 (quoting AS 38.05.126(c) ).

See AS 38.05.505 ; AS 46.15.250.

See, e.g. , Tulkisarmute Native Cmty. Council v. Heinze , 898 P.2d 935, 941 (Alaska 1995).

AS 46.15.010 -.270.

See Ostrem v. Alyeska Pipeline Serv. Co. , 648 P.2d 986, 990 (Alaska 1982) ; see also Weinberg v. N. Alaska Dev. Corp. , 384 P.2d 450, 452 (Alaska 1963).

See Braham v. Fuller , 728 P.2d 641, 642 (Alaska 1986).

See Pankratz v. State, Dep't of Highways , 652 P.2d 68, 75 (Alaska 1982) ; see also G & A Contractors, Inc. v. Alaska Greenhouses, Inc. , 517 P.2d 1379, 1381 (Alaska 1974).

Braham , 728 P.2d at 642-43 (quoting Weinberg , 384 P.2d at 452 ); Ostrem , 648 P.2d at 990-91.

See Columbia Canning Co. v. Hampton , 161 F. 60, 64-65 (9th Cir. 1908).

Id.

See Dalton v. Hazelet , 182 F. 561, 572 (9th Cir. 1910) ; Decker v. Pac. Coast S.S. Co. , 164 F. 974, 976 (9th Cir. 1908) ; Wrangell Ice Co. v. McCormack Dock Co. , 7 Alaska 296, 310-11 (D. Alaska 1925) ; Alaska Juneau Gold Mining Co. v. N. Lumber Mills , 5 Alaska 269, 271 (D. Alaska 1915), aff'd , Worthen Lumber Mills v. Alaska Juneau Gold Mining Co. , 229 F. 966 (9th Cir. 1916) ; Barron v. Alexander , 4 Alaska 591, 596-97 (D. Alaska 1912) ; Thompson v. Pelton , 4 Alaska 510, 517 (D. Alaska 1912).

516 P.2d 1191, 1199-1201 (Alaska 1973).

Id. at 1200-01.

Id. at 1200. We analyzed several cases from other jurisdictions, articulating that a more narrow interpretation would mean only a right of access to the main stream of a channel. Id. at 1199-1200. We noted that these courts were concerned with a "floodgate" argument "that compensation for an obstruction downstream from property would necessitate compensation to all property upstream." Id. at 1200. But due to Alaska's unique features, we found that this floodgates problem would work in reverse; a narrow interpretation would render riparian or littoral land valueless because Alaska "has a seacoast longer than that of the entire United States," "[a] large number of Alaskan communities are located on the shores of bays and inlets," and "[a] substantial amount of development in these cities is along the waterfront." Id. at 1200-01.

Classen v. State, Dep't of Highways , 621 P.2d 15, 16 (Alaska 1980).

Id. at 17.

See Dalton v. Hazelet , 182 F. 561, 572-73 (9th Cir. 1910) ; Ketchikan Spruce Mills v. Alaska Concrete Prods. Co. , 113 F. Supp. 700, 701-02 (D. Alaska 1953) ; Alaska Juneau Gold Mining Co. v. N. Lumber Mills , 5 Alaska 269, 271 (D. Alaska 1915), aff'd , Worthen Lumber Mills v. Alaska Juneau Gold Mining Co. , 229 F. 966 (9th Cir. 1916) ; Dalton v. Katalla Co. , 4 Alaska 410, 415 (D. Alaska 1911).

182 F. at 573.

5 Alaska at 271.

Id.

Id. at 274 (quoting 14 Cyclopedia of Law & Procedure 1207 (William Mack ed., 1904)).

Id. at 276 (discussing affirmatively Barron v. Alexander , 4 Alaska 591, 598 (D. Alaska 1912) ).

Id. at 274-75.

232 P.3d 1203 (Alaska 2010).

Id. at 1210-11.

Id. at 1211.

Id. at 1209, 1212.

Alaska Const. art. VIII, § 16.

Classen v. State, Dep't of Highways , 621 P.2d 15, 17 n.4 (Alaska 1980).

See Alaska Riverways, Inc. , 232 P.3d at 1210-11 (observing that Wernberg "did not specifically address the scope and limitations" of any riparian right except the right of access). In Wernberg we articulated that "an owner of land abutting a body of water (the riparian proprietor) has an individual right to use the water." Wernberg v. State , 516 P.2d 1191, 1194 (Alaska 1973). But aside from stating this "general rule," we did not further discuss the right and only considered the right of access. Id. at 1196, 1198.

See e.g. , Taylor v. Tampa Coal Co. , 46 So.2d 392, 394 (Fla. 1950) ; Bino v. City of Hurley , 273 Wis. 10, 76 N.W.2d 571, 575 (1956).

See Braham v. Fuller , 728 P.2d 641, 642 (Alaska 1986) (defining reasonable use rule in context of melting permafrost); see also Heston v. Ousler , 119 N.H. 58, 398 A.2d 536, 538 (1979).

See G & A Contractors, Inc. v. Alaska Greenhouses, Inc. , 517 P.2d 1379, 1386 (Alaska 1974) ; see also Weinberg v. N. Alaska Dev. Corp. , 384 P.2d 450, 452-53 (Alaska 1963).

Restatement (Second) of Torts § 850A (1979).

We leave it to the superior court on remand to consider that the Lachers have not yet built a dock, and that therefore "[o]ne riparian's right to make a new use may be affected by the fact that other riparians have already put the water to use ... [and] [t]o allow the new use [may] wholly or partially destroy the existing use" unless the two uses can coexist without substantial harm to the other. Id. § 850 cmt. d.

The unreasonable interference with riparian or littoral rights cause of action affects only those rights that a landowner has by virtue of owning land abutting a body of water. While an individual has a private property interest in his or her riparian or littoral right as discussed above, this right is incident to land ownership and does not connote title. See State, Dep't of Nat. Res. v. Alaska Riverways, Inc. , 232 P.3d 1203, 1212-13 (Alaska 2010). Conversely, a private nuisance cause of action affects the real property or water that a landowner holds title to. AS 09.45.255. Because of the incidental relationship between land ownership and riparian or littoral rights, affecting one's riparian or littoral right necessarily affects the use and enjoyment of one's real property to some degree, but to what degree depends entirely on the facts and circumstances of the particular case.

421 P.3d 35, 39, 42 (Alaska 2018) (footnote omitted).

Id. at 45-46.

The Lachers made no claim of interference with any of their upland property rights (such as noise, offensive odors, or pollution). Their only claimed interest was to their rights of access to and use of the water.

Lee v. Konrad , 337 P.3d 510, 525 (Alaska 2014).

Id.