*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ROBERT RIDDLE, d/b/a FAIRBANKS PUMPING AND THAWING, | ) ) ) ) | Supreme Court No. S-15780 |
| Appellant, | ) ) | Superior Court No. 4FA-11-03117 CI |
| v. | ) ) | O P I N I O N |
| ERIC LANSER, | ) ) | No. 7235 – April 6, 2018 |
| Appellee. | ) ) ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: William R. Satterberg, Jr., Fairbanks, for Appellant. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice.

## I.      INTRODUCTION

A nuisance is "a substantial and unreasonable interference with the use or enjoyment of real property."[1] The Right to Farm Act provides that an agricultural facility or an agricultural operation at an agricultural facility used for commercial purposes

---

[1]      AS 09.45.255.

cannot become a nuisance based on changes in surroundings if it was not a nuisance when it started.[2] This appeal presents the question whether odors emanating from a farmer's storage of septage[3] on his farmland created a nuisance to adjacent landowners when the trial court found the farmer was not engaged in commercial agricultural operations but was actually using the farm's septage lagoons to store septage from his separate septic pumping and storing business. We affirm the superior court's finding that the storage of septage created a nuisance and its conclusion that the storage of septage was not protected by the Right to Farm Act.

## II. FACTS AND PROCEEDINGS

### A. Riddle's Farming And Septage Storing Activities

Robert Riddle began acquiring land on Eielson Farm Road near Fairbanks in 2005. The land Riddle purchased was covered by a Farm Conservation Plan[4] issued to a previous owner of the land. In 2005 Riddle began putting in a road and fencing and clearing land. He also acquired farming equipment and maintained both livestock and a pasture that produced sod, potatoes, hay, wheat, and oats.

---

[2]      *See* AS 09.45.235.

[3]      Septage is "[t]he waste content found in a septic tank." *Septage*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2017).

[4]      A State Farm Conservation Plan is required pursuant to regulation 11 Alaska Administrative Code (AAC) 67.177(a) (2018) whenever the State of Alaska sells land classified for agricultural purposes. As the superior court explained, "[a] Farm Plan sets out agricultural covenants and summarizes the purchaser's/owner's commitment to proper agricultural land use and conservation practices, which are represented graphically on a parcel map and with a supplementary written narrative." Farm conservation plans run with the land. *See* 11 AAC 67.177(b) (providing that a farm conservation plan is "incorporated into the sale contract and the conveyance document as a covenant and a condition subsequent, and will be recorded in that form").

Riddle also owned Fairbanks Pumping and Thawing, a business that pumps privately owned septic tanks in the Fairbanks area. Prior to 2005 Riddle paid Golden Heart Utilities approximately 11 cents per gallon to dump the septage he collected. In 2005, the same year he purchased his farmland and began developing his farm, Riddle constructed five septage lagoons on his farm property and began dumping collected septage into the lagoons. The septage lagoons occupied approximately 2 acres of his 500-plus-acre farmland. Riddle did not spread any septage during the winter of 2009. In 2010 Riddle began accepting septage from Bigfoot Pumping and Thawing in addition to the septage from his own company, charging Bigfoot 5 cents per gallon, which was less than half of Golden Heart Utilities' price. Bigfoot dumped at least 2.5 million gallons of septage into the lagoons in 2010 and more than 3.6 million gallons in each of the next two years. Riddle began spreading some septage on his farmland in June 2010.[5]

At trial witnesses confirmed that applying human waste to soil is an accepted farming practice and has long-term beneficial impacts on soil. The Environmental Protection Agency (EPA) specifically encourages the use of domestic septage for fertilizer.[6] Witnesses testified to the importance of spreading fertilizer, including septage, on fields in order to increase the soil's fertility. Witnesses also testified that Riddle's lagoons likely did not contain enough septage to develop the full potential from the land even if all of the stored septage was spread on his fields.

---

[5] At a preliminary injunction hearing Riddle testified that he began spreading septage on his fields in 2009. But Riddle later testified at trial that he could not remember whether he began spreading septage on his fields in 2009 or 2010 but that the date would be in his logs. The date from his logs was June 9, 2010.

[6] *See* EPA, DOMESTIC SEPTAGE REGULATORY GUIDANCE: A GUIDE TO THE EPA 503 RULE, at 10 (1993), https://nepis.epa.gov/Exe/ZyPDF.cgi/200041HP.PDF?Dockey=200041HP.PDF.

**B.      Initial Permitting Process**

In order to legally apply septage to his fields, Riddle was required to secure permits from the EPA, the Alaska Department of Environmental Conservation (Department), and the Fairbanks North Star Borough (Borough).  In April 2007 the Department authorized Riddle to apply domestic septage to his farm through a Solid Waste Disposal Permit.  The permit authorized Riddle to apply domestic septage from private septic tanks and sewage sludge from Golden Heart Utilities Sewage Treatment Plant.  The permit also allowed Riddle to compost sludge acquired from Golden Heart Utilities, but it did not allow him to apply septage from other sources.  Riddle acknowledged in his permit application the possibility that offensive odors could become a nuisance, but he committed to covering his septage stockpiles with non-breathable covers and to using odor inhibitors if necessary.  The permit indicated that the Department could revoke the permit if Riddle did not control the smell, but the Department eventually adopted the position that the Right to Farm Act prevented it from enforcing the odor control provisions of the permit pending the outcome of this litigation.

In September 2007, after a public hearing, the Borough approved a conditional use permit that allowed Riddle to apply septage to his fields.  Riddle testified before the Borough Planning Commission that he dumped all of his septage at Golden Heart Utilities but did not disclose that he was already storing septage on his property. Riddle also testified that he would store septage in a holding cell the size of an Olympic swimming pool, and — contrary to his representation to the Department — that he would not haul septage to the facility or store it there during the winter months; he also stated that he would store septage in the lagoon only during the summer "as [he was] transitioning stuff around." The conditional use permit allowed Riddle to apply biosolids to the property but required that "the principal use of the property . . . be agricultural in

nature" and that the biosolids be used to "support . . . the agricultural use." The permit prohibited him from using the property principally to dispose of biosolids.

In March 2011 Riddle filed a proposed Revised Farm Plan allowing him to construct septage lagoons, and the Division of Agriculture approved the revised plan in April. Under the Farm Plan agriculture must be the primary use of the property and the septage lagoons must be used only to support farming. Riddle did not disclose to the Division that he had already constructed his septage lagoons and had been using them to store septage his septic pumping company had collected from his customers.

### C. Lanser's Development Activities

In 2007 Eric Lanser, a real estate developer, purchased land on Eielson Farm Road adjacent to Riddle's property. Lanser subdivided the property and refurbished a pre-existing house. Although Lanser did not report any smells when he first purchased the land, he attended the 2007 Borough hearing on Riddle's application for a conditional use permit to express his concerns about possible smells emanating from Riddle's farm. Lanser began building and selling new residences soon after his acquisition of the Eielson Farm Road land.

Lanser testified that he first smelled odors from Riddle's farm in May 2010, after Riddle had begun accepting septage from Bigfoot Pumping and Thawing. Lanser first contacted Riddle to request that Riddle "fix" the odors; he then contacted the Borough, which told Lanser that the Department would handle complaints.

In 2010 and 2011 other residents near Riddle's farm also began complaining about the odor. Department representatives went to Eielson Farm Road 10 or 11 times to verify the existence of odors but smelled odors only once. The Department determined that Riddle's farm did not present a public health danger. Lanser continued to develop lots and build and sell residences.

**D.** **Pre-Trial Proceedings**

Lanser sued Riddle and the Department in December 2011. Lanser alleged public and private nuisance and negligence and sought injunctive and declaratory relief. Upon the Department's motion, the superior court dismissed the Department from Lanser's suit.

In April 2012 Superior Court Judge Randy M. Olsen held a four-day hearing on Lanser's motion for a preliminary injunction. Riddle contended that the Right to Farm Act shielded him from liability for private nuisance. The court noted the wide disparity in testimony regarding the strength and frequency of the odor, and it found that "Lanser ha[d] offered no convincing evidence that [Riddle's] farm [was] a sham." The court denied Lanser's request for a preliminary injunction; it also denied Riddle's motion to dismiss the complaint for failure to state a claim.

In August 2012 Lanser served discovery requests on Riddle. Lanser requested information regarding the acreage Riddle cultivated, the amount of crops he produced, the amount of crops sold, the volume of septage on the property, the revenue he earned from storing septage, and other information regarding the operation of Riddle's businesses on the property. Riddle objected to Lanser's discovery requests regarding his farming operations; he contended that Lanser's requests were irrelevant given the superior court's finding from the preliminary injunction hearing that Riddle was operating a legitimate farm. Riddle also filed a motion for summary judgment.

Lanser moved to compel responses to his discovery requests, and based on Riddle's summary judgment motion Lanser moved to expedite his motion to compel. Lanser also filed a motion for an Alaska Civil Rule 56(f) continuance to give him time to respond to Riddle's summary judgment motion. The superior court granted Lanser's motion for continuance but denied his motion for expedited consideration.

Riddle opposed Lanser's motion to compel and reiterated his view that the superior court's preliminary injunction findings disposed of all issues related to whether Riddle was operating a legitimate farm. In November 2012 the court granted Lanser's motion to compel; it concluded that Riddle's "refusal to respond to the discovery requests [was] unreasonable under [Alaska] Civil Rule 37(g)[][7] and may form the basis for an award to [Lanser] of reasonable expenses, including attorney's fees, caused by the conduct."

Following the retirement of Judge Olsen the case was reassigned to Superior Court Judge Bethany Harbison. Riddle asked Judge Harbison to reconsider Judge Olsen's November 2012 order. Judge Harbison denied that request, explaining that "[d]iscovery is not limited by the findings made by the court denying the request for a preliminary injunction or by testimony at the preliminary injunction hearing." Judge Harbison also noted that although a trial on the merits may be merged with the hearing on the preliminary injunction, when this occurs the parties will typically "receive clear and unambiguous notice of the court's intent" to combine those proceedings, which did

---

7  Alaska Civil Rule 37(g) provides:

> If a party or a party's attorney engages in unreasonable, groundless, abusive, or obstructionist conduct during the course of discovery or fails to participate in good faith in the development and submission of a proposed discovery plan . . . , the court may, after opportunity for hearing, require such party or attorney to pay to any other party the reasonable expenses, including attorney's fees, caused by the conduct.

not occur here.[8] Judge Harbison concluded that Judge Olsen had made only preliminary findings that did not limit the scope of discovery.

Pursuant to the superior court's November 2012 order, Lanser moved for attorney's fees and costs under Civil Rule 37(g), requesting about $15,000. Riddle opposed Lanser's motion. The court deferred ruling on the motion until any post-trial application for fees.

In ruling on Riddle's summary judgment motion, the superior court determined that Riddle began a farming enterprise in 2005, that he was engaged in farming, and that he used septage from Fairbanks Pumping and Thawing to fertilize his farm. Because the court concluded that there was a question of material fact whether the purpose of Riddle's farm was commercial agriculture, it denied Riddle's motion for summary judgment on the private nuisance claim. But it did grant summary judgment against Lanser with respect to his public nuisance and negligence claims. Lanser does not appeal these rulings.

### E. Trial And The Superior Court's Decision

The superior court presided over an 11-day bench trial in July and September 2013. The parties re-presented testimony from the preliminary injunction hearing rather than incorporating or referencing previous testimony. In November 2013 the court issued its decision.

In its findings of fact, the court found by clear and convincing evidence that Fairbanks Pumping and Thawing — Riddle's company — had been dumping septage

---

[8]     *See Haggblom v. City of Dillingham*, 191 P.3d 991, 999 (Alaska 2008) ("[T]he parties should normally receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." (second alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))).

into Riddle's lagoons since 2005 but that there was no way to determine how much septage Fairbanks Pumping and Thawing had dumped because Riddle did not keep records. It found that the volume of septage dumped into Riddle's septage lagoons dramatically increased in the winter of 2009-2010 when Bigfoot Pumping and Thawing began dumping septage into the lagoons. The court found that Bigfoot dumped over 2.5 million gallons of septage onto the lagoons in 2010, over 3.7 million gallons in 2011, and over 3.6 million gallons in 2012. Comparatively, Riddle applied only 174,000; 1,084,000; and 377,000 gallons of septage to his fields in those three years.

The court noted Riddle's explanation that he "did not actually apply any of the septage to the land until 2010 because it took from 2005 to 2010 to accumulate enough septage to use on the fields," but it did not find that explanation credible. And the court noted Riddle's testimony that weather conditions often prevented him from applying septage to the fields, but it concluded that if that testimony were true, "weather and field conditions prevent him from making use of more than three-quarters of the total amount of septage that is dumped into his lagoons."

The court also noted Riddle's testimony that he was using some of the septage for compost, which required him to let the septage sit in the lagoons while the water evaporated and then add wood chips to the dewatered and degraded septage. But the court observed that Riddle's Solid Waste Disposal Permit from the Department did not permit him to treat or dewater the septage before applying it to his property. And although Riddle asserted that he intended to request a modification of his permit, the court stated that he likely would not be able to do so given his previous "material misrepresentations" to the various permitting bodies. The court found that the septage being composted in the lagoons could not be intended for farming because composting was beyond the scope of Riddle's permit and that the remaining septage had not been applied to the land and therefore also was not used for farming purposes. The court

credited testimony that Riddle could have applied all of the septage he had to the land and still not have met the nutrient needs of the soil.

The court found that odors from Riddle's lagoons intensified in early 2010 because of the dramatic increase of septage dumped during the preceding winter. The court found that the odors from the septage lagoons made "engaging in outdoor activities . . . extremely unpleasant, and the odors interfere[d] with ordinary activities such as barbequing, gardening, and sitting outdoors. The odors clearly interfere[d] with Lanser's outdoor activities on the land, which include[d] building houses and preparing the land for development."

The court then engaged in a two-step analysis to determine whether Riddle's septage lagoons constituted a private nuisance: (1) whether Riddle's septage lagoons would be a private nuisance in the absence of the Right to Farm Act, and (2) whether the lagoons, if a private nuisance, were "an agricultural facility or an agricultural operation at an agricultural facility" protected by the Right to Farm Act.[9]

The superior court concluded that "Lanser . . . proved by clear and convincing evidence that Riddle's septage lagoons would be a private nuisance if . . . not for the [Right to Farm] Act." The court acknowledged that applying human septage to enrich soil is an accepted agricultural practice, but it concluded that "[t]he septage lagoons unreasonably interfere with Lanser's use and enjoyment of his property." The court also found that Riddle was aware that his "lagoons would unreasonably interfere with Lanser's use and enjoyment of his property"; the court pointed to Riddle's

---

**9** *See* AS 09.45.235(a) ("An agricultural facility or an agricultural operation at an agricultural facility is not and does not become a private nuisance as a result of a changed condition that exists in the area of the agricultural facility if the agricultural facility was not a nuisance at the time the agricultural facility began agricultural operations.").

numerous misrepresentations during the permitting process as evidence that Riddle was aware of the risk and "acted recklessly and/or intentionally."

The court next concluded that Riddle was not shielded from liability as a private nuisance by the Right to Farm Act. It characterized the evidence at trial as suggesting that Riddle's property was not an "agricultural facility" that was "used or [was] intended for use in the commercial production or processing of crops, livestock, or livestock products." The court found that Riddle "ha[d] not sold any crops at all, nor ha[d] he sold any farm products, nor ha[d] he received any income from farming." The court acknowledged that Riddle had allowed a neighbor to sharecrop a portion of his land. And it found that Riddle "seem[ed] to be growing sod for sale" and that "[i]t may be that at some point in the future, his farm will be used in the commercial production of crops or livestock."[10] But although the court conceded that "Riddle may be in the process of developing a nascent commercial farming enterprise," it found that Riddle would have already started selling his products if that were his actual intent.

The court observed that the Right to Farm Act does not provide a definition for "commercial" and recognized that farmers often work their farms for several years before earning any income from farming. Thus the court explained that Riddle's lack of profits from his farming activities and the fact that he earned significantly more income from his septage storage business were not dispositive of the question whether Riddle operated a commercial agricultural facility. But it found that "Riddle's farm appear[ed] to be a 'hobby farm' rather than a commercial farm" and that if this was the case, "his land [was] not an 'agricultural facility' . . . protected by the Act."

---

[10]     The record also shows sales receipts for $1,190 in January 2007 and $425 in August 2008. The January 2007 receipt says "Hay Sales" under "Description" but "Gravel Sales" under "Item"; the August 2008 receipt says only "re: Hay sale — sold by Robert." The court did not address these receipts in its decision.

-11-                                                                7235

We do not rely on the court's findings that Riddle's farm appeared to be a hobby farm and that Riddle sold no crops and therefore do not decide whether they were clearly erroneous. It is evident, however, that the court found that Riddle's agricultural operations did not produce any significant income, and that the vast majority, if not all, of Riddle's income was derived from his septic pumping and storing businesses. The court explained that over the last four years Riddle earned more than $600,000 from septage pumping and storage.

Despite the court's findings, the court determined that it did not need to decide whether Riddle's farm was an agricultural facility because it found that Riddle's septage lagoons were not an "agricultural operation."[11] It found that Riddle was not operating the lagoons "as an incident to or in conjunction with agricultural activities" because the lagoons were being used to store and treat septage rather than to fertilize the soil. And although the court noted that "Riddle intends that the septage disposal business he is operating on his farm will also, at some point in the future, support commercial farming activities," it concluded that "the [Right to Farm] Act does not offer protection from a nuisance that may later support a farming activity[;] [r]ather, the [Right to Farm] Act protects a farming activity that later becomes a nuisance because of subsequent expansion or adoption of new technology." According to the court, "[i]n order to be protected, the septage must be intended for use in farming from the onset." The court therefore found that the Right to Farm Act did not shield Riddle from private nuisance liability.

---

[11]     An "agricultural operation" includes "any agricultural farming activity such as . . . the application and storage of pesticides, herbicides, animal manure, treated sewage sludge or chemicals, compounds, or substances to crops, or in connection with the production of crops or livestock . . . and . . . any practice conducted on the agricultural facility as an incident to or in conjunction with [these] activities." AS 09.45.235(d)(2).

The superior court ordered Riddle to abate the nuisance and provided specific steps for Riddle to take, including implementing a deodorizer system, "monitor[ing] and keep[ing] records of the amounts of septage dumped into the lagoons," and "keep[ing] and maintain[ing] records of his abatement efforts and of any odor complaints he receive[d]." The court awarded Lanser his full costs pursuant to Alaska Civil Rules 54[12] and 79,[13] and 40% of his attorney's fees under Alaska Civil Rule 82(b)(3) based on "vexatious or bad faith conduct" and "reasonableness of the claims and defenses pursued by each side."[14] The court also awarded Lanser fees and costs under Civil Rule 37(g) as discovery sanctions.

Riddle appeals.

## III.   STANDARD OF REVIEW

"We review questions of law and the trial court's application of the law to facts de novo."[15] "In exercising our independent judgment, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[16]  "We review a trial

---

[12]     Alaska Civil Rule 54(d) provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs."

[13]     Alaska Civil Rule 79 governs the process for determining the costs awarded to the prevailing party.

[14]     Alaska Civil Rule 82(b)(3) authorizes the court to vary an attorney's fees award from the presumptive 30% award in Alaska Civil Rule 82(b)(2) based on a number of factors, including "vexatious or bad faith conduct" and "the reasonableness of the claims and defenses pursued by each side."

[15]     *Maddox v. Hardy*, 187 P.3d 486, 491 (Alaska 2008) (citing *Petrolane, Inc. v. Robles*, 154 P.3d 1014, 1018 (Alaska 2007)).

[16]     *Douglas Indian Ass'n v. Cent. Council of Tlingit and Haida Indian Tribes of Alaska*, 403 P.3d 1172, 1175 (Alaska 2017) (quoting *Healy Lake Vill. v. Mt. McKinley*
(continued...)

court's factual findings under a clearly erroneous standard. A factual finding is clearly erroneous when we are 'left with a definite and firm conviction on the entire record that a mistake has been made.' "[17]

"We review awards of costs and attorney's fees for abuse of discretion, which exists if an award is arbitrary, capricious, manifestly unreasonable, or improperly motivated."[18] And "[w]e review a trial court's decision to impose sanctions for discovery violations for abuse of discretion."[19] But whether the trial court correctly applied the law in awarding attorney's fees or sanctions is a question of law that we review de novo.[20] And while we review for abuse of discretion the decision whether to enhance attorney's fees or to sanction a party because of an unreasonable legal position, the question whether that position was unreasonable will usually be a legal question subject to de novo review.[21]

---

[16](...continued)
*Bank*, 322 P.3d 866, 871 (Alaska 2014)).

[17]    *Fernandes v. Portwine*, 56 P.3d 1, 4 (Alaska 2002) (quoting *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000)).

[18]    *Id.* at 4-5 (quoting *Kellis v. Crites*, 20 P.3d 1112, 1113 (Alaska 2001)).

[19]    *Whittle v. Weber*, 243 P.3d 208, 211 (Alaska 2010) (citing *Underwriters at Lloyd's London v. The Narrows*, 846 P.2d 118, 119 (Alaska 1993)).

[20]    *See Okagawa v. Yaple*, 234 P.3d 1278, 1280 (Alaska 2010) (quoting *Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 252 (Alaska 2009)); *Prentzel v. State, Dep't of Pub. Safety*, 169 P.3d 573, 594 (Alaska 2007) (citing *Peter v. Progressive Corp.*, 986 P.2d 865, 867 (Alaska 1999)).

[21]    *See Alaska Building, Inc. v. Legislative Affairs Agency*, 403 P.3d 1132, 1134 (Alaska 2017).

## IV.   DISCUSSION

Riddle argues that the septage lagoons on his property were not a nuisance. And he argues that even if the septage lagoons would normally constitute a nuisance, he is shielded from private nuisance liability by the Right to Farm Act.  Finally, he contests the superior court's decision to grant attorney's fees above the presumptive 30% amount under Civil Rule 82(b) and discovery sanctions under Civil Rule 37(g).

### A.   Private Nuisance Liability

A nuisance is "a substantial and unreasonable interference with the use or enjoyment of real property."[22]  "Private nuisance liability results from an intentional and unreasonable interference with another's use and enjoyment of his or her own property" or from "[u]nintentional conduct . . . if negligent, reckless, or abnormally dangerous.  To incur liability, an actor's conduct must be a substantial factor in causing the nuisance."[23]

In this case the superior court found that "Riddle's septage lagoons would be a private nuisance if not for the [Right to Farm] Act" because "[t]he septage lagoons unreasonably interfere[d] with Lanser's use and enjoyment of his property."  On appeal Riddle argues that trial testimony did not support the court's nuisance finding and that the court should have balanced the harm to Lancer against the social utility of farming. We conclude that the superior court did not clearly err in its factual findings and that these findings made any balancing of societal interests unnecessary in this case.

The superior court found by clear and convincing evidence that beginning in the early spring of 2010, "Lanser and other neighborhood residents began to smell

---

[22]   AS 09.45.255.

[23]   *Parks Hiway Enters., LLC v. CEM Leasing, Inc.*, 995 P.2d 657, 666 (Alaska 2000) (citing RESTATEMENT (SECOND) OF TORTS §§ 822(a)-(b), 834 (AM. LAW INST. 1965)).

strong, pervasive, and persistent foul odors originating with Riddle's septage lagoons." These odors were "so strong and so foul that engaging in outdoor activities [was] often extremely unpleasant," and "[t]he odors clearly interfere[d] with Lanser's outdoor activities on the land, which include[d] building the houses and preparing land for development." "The odors beg[a]n at breakup and endure[d] through freezeup."

Lanser's testimony supported these findings: Lanser testified that the smell was "very overwhelming" and that it was like "sticking your head in [a] nasty outhouse." He asserted that it was "just always around [him]" and that he smelled the "remarkable" odors "two times a week . . . on average."

The court found that it was the lagoons themselves and not the spreading of septage on Riddle's fields that caused the odors; Riddle had not yet started applying septage to his fields when the odors first arose. The court found that the odors first appeared in the early spring of 2010 because "[d]uring that winter, Bigfoot Pumping and Thawing . . . stopped dumping its septage at the wastewater treatment plant owned by [Golden Heart Utilities] and began dumping its septage into the lagoons on Riddle's property. In calendar year 2010, Bigfoot dumped at least 2,520,857 gallons of septage into Riddle's septage lagoons."

The facts found by the superior court are supported by the record and are sufficient to establish that Riddle's septage lagoons constitute a private nuisance affecting Lanser's property, absent a successful Right to Farm Act defense. Riddle made an intentional business decision to create septage lagoons on his property, dump septage from his own septic pumping business into the lagoons, and contract with Bigfoot to dispose of millions of gallons of Bigfoot's septage in the lagoons. These lagoons then produced a foul odor that substantially interfered with Lanser's use and enjoyment of his property. As the House of Lords explained nearly 150 years ago:

The person . . . whose habitation is made unhealthy by the fumes and noisome vapours of his neighbour's . . . works[] is damnified without any fault of his own; and it seems but reasonable and just that the neighbour who has brought something on his own property (which was not naturally there) . . . should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property.[24]

As for Riddle's argument that the superior court should have balanced the harm to Lanser with the societal good of farming activities, we have never recognized a balancing test in our nuisance cases, and we do not have to consider whether we should adopt one today. The superior court found that the offending odors began before Riddle used the septage in any farming capacity and that Riddle did not intend to use the septage in the lagoons for farming. The societal value of farming is therefore irrelevant.

The superior court did not clearly err in its findings, and we agree with the court's determination that Riddle's septage lagoons were a private nuisance unless the Right to Farm Act shielded Riddle from nuisance liability.

B.    The Right To Farm Act

Right to Farm Acts address the problem caused by the urbanization of farming areas.[25] "The Acts are primarily intended to protect agricultural producers from nuisance actions that result from the encroachment of residential development onto

---

[24]    *Rylands v. Fletcher* [1868] 3 LRE & I. App. 330 (HL) 340 (appeal taken from Eng.).

[25]    *See* ch. 34, § 1, SLA 1986 ("The legislature . . . finds that conflict between agricultural operations and urban and suburban land uses threatens the permanent loss of agricultural land."); Minutes, Sen. Judiciary Comm. Hearing on S.B. 60, 22d Leg., 1st Sess. (Mar. 30, 2001) (statement of Hans Neidig, Legislative Aide to Senator Lyda Green, Bill Sponsor) ("As urbanization swallows up farming areas, many farmers have experienced encroachment on their rights to farm.").

traditionally agricultural lands. . . . All 50 states have enacted some type of [Right to Farm] Act."[26]

> Alaska's Right to Farm Act provides that
>
> [a]n agricultural facility or an agricultural operation at an agricultural facility is not and does not become a private nuisance as a result of a changed condition that exists in the area of the agricultural facility if the agricultural facility was not a nuisance at the time the agricultural facility began agricultural operations.[27]

The Act defines "agricultural facility" as "any land, building, structure, pond, impoundment, appurtenance, machinery, or equipment that is used or is intended for use in the commercial production or processing of crops, livestock, or livestock products, or that is used in aquatic farming."[28] An "agricultural operation" includes

> any agricultural and farming activity such as . . . the application and storage of pesticides, herbicides, animal

---

[26] Harrison M. Pittman, *Validity, Construction, and Application of Right-to-Farm Acts*, 8 A.L.R.6th 465 (2005); *see also Shatto v. McNulty*, 509 N.E.2d 897, 900 (Ind. App. 1987) ("The policy of the legislature is clear. People may not move to an established agricultural area and then maintain an action for nuisance against farmers because their senses are offended by the ordinary smells and activities which accompany agricultural pursuits."); *Charter Twp. of Shelby v. Papesh*, 704 N.W.2d 92, 99 (Mich. App. 2005) ("The Legislature undoubtedly realized that, as residential and commercial development expands outward from our state's urban centers and into our agricultural communities, farming operations are often threatened by local zoning ordinances and irate neighbors. It, therefore, enacted the Right to Farm Act to protect farmers from the threat of extinction caused by nuisance suits arising out of alleged violations of local zoning ordinances and other local land use regulations as well as from the threat of private nuisance suits." (quoting *Northville Twp. v. Coyne*, 429 N.W.2d 185, 187 (Mich. App. 1988))).

[27] AS 09.45.235(a).

[28] AS 09.45.235(d)(1).

manure, treated sewage sludge or chemicals, compounds, or substances to crops, or in connection with the production of crops or livestock . . . and . . . any practice conducted on the agricultural facility as an incident to or in conjunction with [these] activities.[29]

---

[29]   AS 09.45.235(d)(2). The Act defines an "agricultural operation" in full as

(A) any agricultural and farming activity such as

(i) the preparation, plowing, cultivation, conserving, and tillage of the soil;

(ii) dairying;

(iii) the operation of greenhouses;

(iv) the production, cultivation, rotation, fertilization, growing, and harvesting of an agricultural, floricultural, apicultural, or horticultural crop or commodity;

(v) the breeding, hatching, raising, producing, feeding, keeping, slaughtering, or processing of livestock;

(vi) forestry or timber harvesting, manufacturing, or processing operations;

(vii) the application and storage of pesticides, herbicides, animal manure, treated sewage sludge or chemicals, compounds, or substances to crops, or in connection with the production of crops or livestock;

(viii) the manufacturing of feed for poultry or livestock;

(ix) aquatic farming;

(x) the operation of roadside markets; and

(B) any practice conducted on the agricultural facility as an incident to or in conjunction with activities described in (A) of this paragraph, including the application of existing, changed, or new technology, practices, processes, or

(continued...)

-19-                                                7235

"[T]he time an agricultural facility began agricultural operations refers to the date on which any type of agricultural operation began on that site regardless of any subsequent expansion of the agricultural facility or adoption of new technology."[30]

Riddle argues that his septage lagoons are part of an agricultural facility or an agricultural operation at an agricultural facility and that he is shielded from nuisance liability by the Act. We disagree: even assuming, as the superior court did, that Riddle's farming activities were enough to constitute a commercial agricultural facility, and assuming that his septage lagoons eventually became an agricultural facility or an agricultural operation at an agricultural facility, Riddle still did not use or intend to use the septage in the lagoons in any farming capacity until after the lagoons had already become a nuisance.

As previously explained, the purpose of the Right to Farm Act is to protect commercial agricultural facilities or operations from nuisance suits based on the encroachment of housing communities onto land that was previously farmland or previously unused. If an agricultural facility or operation was not a nuisance when agricultural operations initially began — that is before houses began to be constructed adjacent to the facility — changes in the facility's surroundings cannot turn the facility or operation into a nuisance. But these are not the facts of this case. The superior court found that Riddle did not use or intend to use his septage lagoons in any commercial agricultural capacity until after they had already become a nuisance. This is not the situation the Act was designed to address: the Act was meant to protect commercial

---

[29](...continued)
    procedures.

    *Id.*

[30]    AS 09.45.235(a).

agricultural facilities or operations that would otherwise become nuisances, not nuisances that may later become agricultural facilities or operations.

As the superior court found, Riddle's septage lagoons were not part of an "agricultural facility" or "agricultural operation at an agricultural facility" at any point from their creation until they became a nuisance. The Act only provides protection "*if the agricultural facility was not a nuisance at the time the agricultural facility began agricultural operations.*"[31] Riddle did not begin spreading septage on his fields until June 2010, "a few months after the odors from the septage lagoons began to bother his neighbors." Thus, the lagoons were already a nuisance by the time they might have qualified as an agricultural facility or operation under the Act.

Riddle's earlier limited farming operations on the property do not shield him from nuisance liability. Riddle states that his property contained farm equipment and that he had used the property to grow crops and raise livestock and had allowed a neighbor to sharecrop a portion; he argues that his farm was an agricultural facility that began agricultural operations before the septage lagoons located on the property became a nuisance. Even if this is correct,[32] the septage lagoons were not a part of his agricultural facility because they were not "used or . . . intended for use" in farming at

---

[31] AS 09.45.235(a) (emphasis added).

[32] One of the qualifying conditions for an agricultural facility to receive the protection of the Right to Farm Act is that the facility be used or intended to be used "in the *commercial* production or processing of crops, livestock, or livestock products." AS 09.45.235(d)(1) (emphasis added). The superior court characterized Riddle's farm as a "hobby farm" that was not of a sufficiently commercial character to qualify as an agricultural facility under the Act, but it determined it did not need to decide this question because it found that Riddle's septage lagoons were not an agricultural operation. Given our resolution of the appeal, we also do not decide whether Riddle's farm was an agricultural facility.

the time.[33]  Nor does Riddle's eventual use of the lagoons in farming constitute a "subsequent expansion of the agricultural facility."[34]  The Act allows agricultural facilities to expand their existing agricultural operations without incurring new liabilities. It does not provide a means to immunize an existing, nonagricultural nuisance.  Because Riddle began spreading septage from the lagoons on his fields only after the lagoons became a nuisance, the Right to Farm Act does not protect him.[35]

---

[33]  AS 09.45.235(d)(1).  To the extent that Riddle challenges the superior court's finding that he did not intend to use the lagoons in his farming operations, we review this finding for clear error and find none.  The superior court considered how long it took Riddle to start applying septage to his fields and how little he applied once he started.  The court questioned his reasons for the minimal spreading and concluded that his intention in occasionally applying septage to his fields "was more to dispose of the septage than to prepare the land for farming" and that he did not intend to use the septage in the lagoons for farming.  These findings are supported by the record and are not clearly erroneous.

[34]  AS 09.45.235(a) ("For purposes of this subsection, the time an agricultural facility began agricultural operations refers to the date on which any type of agricultural operation began on that site regardless of any subsequent expansion of the agricultural facility or adoption of new technology.").

[35]  AS 09.45.235(a) also says, "An agricultural facility or an agricultural operation at an agricultural facility is not a private nuisance if the governing body of the local soil and water conservation district advises the commissioner in writing that the facility or operation is consistent with a soil conservation plan developed and implemented in cooperation with the district."  Riddle argues that this clause protects his septage lagoons "because, during all relevant times, [Riddle] operated the [farm] under Division of Agriculture, Alaska DNR, Farm Plans that were in place and which run with the land."  This is unpersuasive.  A farm plan is not a "writing" of "the governing body of the local soil and water conservation district . . . that the facility or operation is consistent with a soil conservation plan."  Indeed the 1986 Farm Conservation Plan that came with the property "require[s]" and the 2011 Farm Conservation Plan that Riddle requested "strongly urges" Riddle to develop a separate local soil and water conservation plan.  The 1986 Farm Conservation Plan explains that "[t]he Soil and Water

(continued...)

## C. Attorney's Fees And Costs

At the conclusion of the trial Lanser moved for attorney's fees under Alaska Civil Rule 82(b), and he requested additional fees as sanctions relating to discovery violations under Alaska Civil Rule 37(g). The superior court granted enhanced attorney's fees under Civil Rule 82(b)(3) due in part to Riddle's unreasonable conduct during discovery, and it also granted Lanser's requests for fees and costs as sanctions under Civil Rule 37(g). Riddle makes multiple claims of error with respect to both rulings. We affirm some aspects of these awards and reverse or vacate others.

### 1. Civil Rule 82(b)(3) enhanced fees

Under Civil Rule 82(b)(2) the presumptive award to a party not seeking a monetary award who prevailed at trial is 30% of his reasonable and necessary attorney's fees. But "[t]he court may vary an attorney's fees award . . . if . . . the court determines variation is warranted."[36] In making that determination the court may consider a number of factors, including "the complexity of litigation," "the length of trial," "the reasonableness of the claims and defenses pursued by each side," and "vexatious or bad faith conduct" by the litigants.[37]

Upon consideration of the Rule 82(b)(3) factors, the superior court increased Lanser's attorney's fees from the presumptive 30% award to 40%. The court

---

[35](...continued)
Conservation Plan is not a part of the State Farm Conservation Plan or the State Farm Development Plan." Riddle has not placed into the record a document from the governing body of the local soil and water conservation district advising the Department that he is in compliance with a local soil and water conservation plan. Thus the Act does not shield him from nuisance liability on this basis.

[36]     Alaska R. Civ. P. 82(b)(3).

[37]     Alaska R. Civ. P. 82(b)(3)(A), (B), (F), (G).

focused primarily on two factors: Riddle's bad faith conduct and the unreasonableness of Riddle's defense. The court found that "Riddle 'made material misrepresentations to both the Borough and to the [Department] when he applied for his original permits' regarding his intended use of the land." And the court determined that Riddle's misrepresentations to the Borough and the Department demonstrated that, while Riddle might have intended at some later time to use his property for commercial agricultural operations, he was not operating a commercial agricultural facility at the time, and that therefore his Right to Farm Act defense was unreasonable.

Riddle argues that it was error (1) to consider his conduct outside of litigation, (2) to find that his Right to Farm Act defense was unreasonable, and (3) not to count against Lanser some of Lanser's litigation conduct. We agree that consideration of Riddle's conduct outside of litigation and the conclusion his Right to Farm Act defense was unreasonable were erroneous; it was not an abuse of discretion not to penalize Lanser for his litigation conduct.

We have explained that "[t]he purpose of Civil Rule 82 is to compensate a prevailing party partially, not fully, for attorney's fees *incurred in litigation*."[38] When an award of Rule 82 fees is enhanced for bad faith conduct, the conduct at issue must have occurred during the litigation.[39] The trial court may not consider "actions taken during the underlying transaction or other litigation between the parties."[40] The superior court was apparently aware of this rule: the court relied on it when denying Lanser's request for attorney's fees that Lanser incurred while trying to stop Riddle's conduct

---

[38] *Demoski v. New*, 737 P.2d 780, 788 (Alaska 1987) (emphasis added).

[39] *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 145 (Alaska 2004).

[40] *Id*.

through means outside the current litigation.[41] The court nevertheless increased its Rule 82(b)(3) attorney's fees award against Riddle "because Riddle did misrepresent his intentions and actions *both before and during* litigation." To the extent that the court considered Riddle's conduct outside of litigation, this was error.

The superior court also found that Riddle misrepresented the manner in which he planned to store the septage, the size of the lagoons, the length of time he planned to store the septage, and the volume of the septage he planned to store. And it found that Riddle intended only to store septage and not to actually use the septage in a farming capacity. This led the court to conclude that Riddle's Right to Farm Act defense was unreasonable. We disagree. The superior court may take into account any misrepresentations that Riddle made during litigation in considering an attorney's fees award,[42] but we cannot conclude on the record before us that Riddle's Right to Farm Act defense was unreasonable. A party need not prevail on his claims or defenses for them to be reasonable.[43] By way of analogy, Alaska Civil Rule 11(b)(2) requires lawyers not to present "claims, defenses, [or] other legal contentions" unless they "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing

---

[41] Lanser requested attorney's fees for his extrajudicial attempts to stop Riddle from storing septage on Riddle's farm, which included "contacting the EPA and the Fairbanks Soil and Water Conservation District Board and petitioning the local municipality to change existing ordinances." The superior court denied Lanser's request because these attorney's fees were not incurred in litigation.

[42] These misrepresentations also may be considered in support of the superior court's factual finding that Riddle did not intend to use the septage in his lagoons for commercial agricultural operations but instead intended to use the lagoons to store the septage his business and Bigfoot pumped from septic tanks.

[43] *See Marathon Oil Co. v. ARCO Alaska, Inc.*, 972 P.2d 595, 604-05 (Alaska 1999) (holding that party's position was not unreasonable because it "raised a legitimate issue").

existing law or for establishing new law." The language of the Right to Farm Act is broad and, until this case, has not been interpreted by this court. Riddle's Right to Farm Act defense was arguable, even though it was unsuccessful; it was not frivolous. We conclude that to the extent that the superior court relied on its determination that Riddle's Right to Farm Act defense was unreasonable in making its attorney's fees award, this was error.

Riddle further argues that "[t]he superior court abused its discretion by failing to consider Lanser's bad faith conduct." Riddle claims that "Lanser failed to fully supplement [his] Rule 26 disclosures and withheld information regarding his attempts to shut down [Riddle's] farm." Riddle claims that Lanser "conducted a series of records depositions without providing notice to [Riddle] while a motion to compel . . . was pending." But the superior court at no time during the litigation found that Lanser acted in bad faith. The superior court noted that "Lanser could have taken a different course of action" with respect to the depositions but explained that "it was ultimately Riddle's noncooperation that led to Lanser incurring the additional fees." The court did not abuse its discretion in not holding Lanser's litigation conduct against him in its attorney's fees analysis.

To summarize, the superior court has broad discretion in awarding attorney's fees under Civil Rule 82(b)(3), but the court may not hold actions before litigation started or arguably reasonable defenses against the losing party. To the extent that the superior court based its award on these impermissible considerations, we reverse and remand to the superior court for reconsideration of its order in light of our holding.[44]

---

[44]     In devising its new Civil Rule 82 attorney's fees award on remand, the superior court also should be careful not to penalize Riddle twice for the same conduct. Conduct that is being sanctioned under Civil Rule 37(g) should not also be held against
(continued...)

## 2. Civil Rule 37(g) sanctions

Under Civil Rule 37(g) the trial court may require a party "to pay to any other party the reasonable expenses, including attorney's fees," when that party "engages in unreasonable, groundless, abusive, or obstructionist conduct during the course of discovery." And when the court grants a motion to compel discovery under Civil Rule 37(a)(4)(A), the court "shall" require the party whose conduct necessitated the motion to pay the moving party's reasonable expenses, including attorney's fees, unless the moving party failed to make a good faith effort to avoid court action, the non-moving party's objections were "substantially justified," or "other circumstances [would] make an award of expenses unjust."

The superior court granted Lanser's Rule 37(g) motion for fees and costs in connection with the court's earlier order granting his motion to compel discovery responses under Rule 37(a). The court found that Riddle's "refusal to respond to the discovery requests [was] unreasonable" and that Riddle's conduct "necessitated [Lanser's] motion to compel" and "caused unnecessary delays and higher litigation costs."

Riddle argues that the court "erred when it found that [he] was unreasonable during discovery," and he argues that "willfulness must be demonstrated before sanctions may be imposed under Civil Rule 37." Riddle claims that he did not engage in any "willful conduct [that would] warrant[] an award of expenses as sanctions." He asserts that his objection to Lanser's discovery requests were based on

---

[44](...continued)
Riddle in the court's Civil Rule 82(b)(3) attorney's fees determination. *Cf. Heustess v. Kelley-Heustess*, 259 P.3d 462, 477 (Alaska 2011) (remanding for additional findings because "we [could not] tell whether the court double-counted [husband's] vexatious litigation conduct by considering it in the overall property distribution and in its award of enhanced fees").

his belief that Lanser's "requests were irrelevant to [the] private nuisance claim" in light of Judge Olsen's preliminary finding that Riddle was operating a "legitimate farm." He claims that he did not know that Judge Olsen's findings did not have binding or precedential value.

Riddle is incorrect that Rule 37(g) requires a showing of willfulness before the court may impose sanctions. The cases Riddle relies on to support his argument all involve the trial court's authority to impose litigation-ending or claim-dismissing sanctions under Rule 37(b).[45] Riddle points to no case or other authority suggesting that the trial court must make an explicit finding of willfulness when ordering sanctions under Rule 37(g). And nothing in the language of the rule indicates that willfulness is required; all that is required is that the party or the party's attorney engage in "unreasonable, groundless, abusive, or obstructionist conduct during the course of discovery."[46] The superior court did not need to find that Riddle acted willfully for it to order Riddle to pay Lanser's attorney's fees and costs as sanctions under Rule 37(g).

Riddle argues the superior court erred when it found that he acted unreasonably in objecting to Lanser's discovery requests. It did not. Riddle's opposition

---

[45] *See Strong Enters., Inc. v. Seaward*, 980 P.2d 456, 460-61 (Alaska 1999) (noting that "the discovery master did not find that Strong had wilfully violated any outstanding discovery order *or* that Strong's conduct in discovery so thwarted the discovery process that the requirements of Civil Rule 37(g) were necessarily established" (emphasis added)); *Honda Motor Co. v. Salzman*, 751 P.2d 489 (Alaska 1988) (reviewing establishment of liability as a sanction for violating discovery orders); *Hawes Firearms Co. v. Edwards*, 634 P.2d 377 (Alaska 1981) (same). Rule 37(b)(3) requires courts to consider the willfulness of a discovery-order violation when imposing sanctions that affect the proceedings and provides in part, "The court shall not make an order that has the effect of establishing or dismissing a claim or defense or determining a central issue in the litigation unless the court finds that the party acted willfully."

[46] Alaska R. Civ. P. 37(g).

was based entirely on his belief that Judge Olsen's preliminary findings were conclusive and precluded discovery on his farm's legitimacy. Findings made in the course of a preliminary injunction proceeding are, by definition, preliminary. At preliminary proceedings, a trial court may not be presented with all of the evidence that may be developed during subsequent discovery as the case proceeds, and when the court is presented with a more well-developed factual record at trial, the court may change its view of the evidence. Normally, only when the court specifically notifies the parties that it intends to combine the preliminary injunction hearing and trial could the court treat its preliminary injunction findings as conclusive.[47]

Riddle next argues that even if the superior court was entitled to award fees and costs under Rule 37(g), it abused its discretion by awarding Lanser excessive and unreasonable fees and costs as sanctions. He asserts that Lanser's attorneys overcharged like the attorneys did in *Demoski v. New*.[48] But as Lanser points out, the proper amount of attorney's fees is case-specific.[49] And although Riddle contends that a fee award

---

[47] *See Haggblom v. City of Dillingham*, 191 P.3d 991, 999 (Alaska 2008) ("[T]he parties should normally receive clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." (second alteration in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))).

[48] 737 P.2d 780, 787 (Alaska 1987) (concluding that superior court did not err in reducing attorney's fees where attorneys had overcharged their clients, duplicated work, and "generated . . . unnecessary work by making vituperative attacks on opposing counsel").

[49] *See Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 332 P.3d 554, 561 (Alaska 2014) (noting that "the trial court is 'uniquely suited' to make" determinations about the reasonableness of attorney hours "because of its 'greater knowledge of the case' " (quoting *Valdez Fisheries Dev. Ass'n v. Froines*, 217 P.3d 830, 833 (Alaska (continued...)

under $1,000 is appropriate for a motion to compel, the case he cites is a child support case with different facts, different legal issues, and a different level of complexity.[50] There is nothing in *Demoski* to suggest that a motion to compel can never take more than $1,000 worth of attorney time.

We analyze the superior court's attorney's fees and costs award for an abuse of discretion based on the facts of this case.[51] Riddle argues there are six instances where the court awarded excessive fees: (1) Lanser's motion to compel; (2) Lanser's work on his motion for expedited consideration of his motion to compel; (3) depositions taken while the motion to compel was pending; (4) pleading practice over quashing Bigfoot's subpoena; (5) Lanser's Civil Rule 56(f) motion; and (6) updates to Lanser's expert report.

Riddle first objects to the $3,612 awarded to Lanser for work related to the motion to compel. He contends that Lanser overbilled because one attorney drafted and then "[f]inish[ed]" the motion to compel, only to have another attorney conduct research, revise, and again finalize the motion. Riddle asserts that the superior court abused its discretion in what he contends is a clear case of overbilling. The first timekeeper spent 4.3 hours researching Rule 37 case law, 1.3 hours drafting the motion, and 0.9 hours finishing the motion. The second timekeeper spent 0.9 hours reviewing case law, 1.3 hours revising the motion, and 3 hours finalizing the motion, preparing exhibits, drafting

---

[49](...continued)
2009))).

[50]    *See Kestner v. Clark*, 182 P.3d 1117, 1125 & n.32 (Alaska 2008) (concluding that superior court did not abuse its discretion by awarding moving party, who had requested $2,822 in fees, $782 "for work directly related to the motion to compel").

[51]    *See Fernandes v. Portwine*, 56 P.3d 1, 4-5 (Alaska 2002).

an affidavit of counsel in support of the motion, and drafting an order compelling discovery responses. The superior court is in the best position to discern whether these amounts of time were necessary and reasonable, and we perceive nothing that causes us to conclude the court abused its discretion in its fee award.

Riddle next objects to the $607 awarded to Lanser for work on the motion for expedited consideration. He argues that "[t]he motion was clearly not necessary" because Lanser had also brought a motion for continuance under Civil Rule 56(f). But Riddle had put Lanser in a precarious position: he objected to Lanser's discovery requests and then moved for summary judgment. In response Lanser brought two motions: one for expedited consideration of his motion to compel and a Rule 56(f) motion for a continuance in the alternative. Because the court granted Lanser's motion for continuance, the motion for expedited consideration was mooted. Although the motion for expedited consideration was ultimately unnecessary, the superior court did not abuse its discretion when it granted Lanser attorney's fees associated with preparing that motion.

Riddle next claims that the superior court abused its discretion when it awarded Lanser "$1,593 in attorney's fees and $411.23 for the records depositions [Lanser] conducted while his [m]otion to [c]ompel was pending." Riddle contends that Lanser did not provide notice of the depositions. And he states that Lanser sought information in these depositions that was not part of his initial discovery request. He argues that the fees therefore cannot be attributed to Riddle's conduct during discovery. Lanser responds that Riddle's suggestion that Lanser could have waited until the court ruled on his motion to compel presumes that he would win that motion. Although Riddle argues that he should not be penalized for Lanser's duplicative work, Lanser was employing alternative litigation strategies in the event that one or the other did not succeed. And the fact that Lanser did not seek to obtain exactly the same information

in the depositions as he did in his discovery requests does not mean that the depositions did not result from Riddle's objections to Lanser's discovery requests.  The superior court did not abuse its discretion in awarding Lanser fees for these depositions.

Riddle next objects to $1,822.50 the court awarded Lanser for motion practice related to Riddle's effort to quash a subpoena Lanser served on Bigfoot.  He claims that these fees were only necessary as a result of Lanser's attempt to depose witnesses without notifying Riddle.  But as discussed above, the depositions were a legitimate attempt by Lanser as an alternative litigation strategy to respond to Riddle's opposition to producing discovery to Lanser and Riddle's motion for summary judgment. The superior court did not abuse its discretion in awarding Lanser these fees.

Riddle next objects to $3,465 awarded to Lanser for his Rule 56(f) motion. Riddle claims that the Rule 56(f) motion was essentially copied from Lanser's motion to compel.  The total attorney's fees awarded for the two motions were $7,077, which Riddle argues was an unreasonable award for "duplicated work."  Lanser responds correctly that Riddle did not raise this objection in the superior court; we therefore review for plain error and find none.[52]  While there is overlap between the two motions, the superior court is in the best position to determine whether the attorney's fees were reasonable.  We see nothing in the record to suggest that the court plainly erred.

Riddle finally objects to $2,953.53 in costs awarded to Lanser for time spent updating an expert report.  Lanser's expert prepared his original report using estimates of the volume of septage that was being stored on Riddle's property because Riddle had not yet responded to discovery requests.  Lanser argued that his expert would have to redo his report when Riddle produced the records, and Lanser therefore

---

[52]     *See Ace Delivery & Moving, Inc. v. State, Alaska State Comm'n for Human Rights, ex rel. Wass*, 350 P.3d 776, 781-82 (Alaska 2015).

requested half of the cost of the original report as compensation for Riddle's discovery objections. The superior court deferred ruling on the motion until post-trial when it awarded half of the cost of the initial expert report as a sanction. Riddle argues that Lanser failed to show what additional cost, if any, was incurred by updating the report. Riddle is correct that Lanser did not indicate what fees were incurred by updating the report. While Lanser did not know the cost of the updated expert report at the time of his motion, he did know that cost at the time he requested fees after trial. We agree with Riddle that it was an abuse of discretion to award the pre-trial estimated expert report costs. The superior court could have determined the actual cost of updating the expert report when it awarded sanctions rather than relying on the estimate produced at the time Rule 37(g) sanctions were initially requested. We therefore vacate the award of $2,953.53 in costs and remand for the superior court to award the actual cost to Lanser of the expert's updates to the report.

## V.    CONCLUSION

We agree with the superior court that Riddle's septage lagoons constituted a private nuisance and that Riddle was not shielded from nuisance liability by the Right to Farm Act. We therefore AFFIRM the private nuisance and Right to Farm Act rulings of the court. The court considered factors outside the scope of the pending litigation in awarding attorney's fees under Civil Rule 82(b)(3) and it appears to have based its fee award, at least in part, on an erroneous conclusion that Riddle's Right to Farm Act defense was unreasonable; we REVERSE the attorney's fees award and REMAND for the court to reconsider this award. It was an abuse of discretion for the court to rely on a pre-trial estimate of the cost of updating Lanser's expert's report rather than the actual cost when the actual cost was readily available to the court; we VACATE the award of $2,953.53 in costs under Civil Rule 37(g) and REMAND for the court to determine and award the actual cost of updating the report. The superior court did not abuse its

discretion in awarding any other attorney's fees or costs under Civil Rule 37(g), and we AFFIRM these awards. We do not retain jurisdiction.